491 S.E.2d 294

**Gordon Wayne WELSHMAN, Sometimes Known as Gordon Wayne Welshman, Jr.**

**v.**

**COMMONWEALTH of Virginia.**

**Record No. 0818-96-3.**

Court of Appeals of Virginia,
Richmond.

Oct. 7, 1997.

Clinton R. Shaw, Jr., Lynchburg (Office of the Public Defender, on brief), for appellant.

Eugene Murphy, Assistant Attorney General (James S. Gilmore, III, Attorney General, on brief), for appellee.

Present: BENTON and ANNUNZIATA, JJ., and DUFF, Senior Judge.

ANNUNZIATA, Judge.

Following a bench trial, appellant, Gordon Wayne Welshman, Jr., was convicted of possession of cocaine with intent to distribute. On appeal, he contends that the trial court erred in denying his motion to suppress the cocaine and that the evidence is insufficient to support his conviction. We hold that appellant was unlawfully seized and that, as a consequence, the cocaine recovered as a result of his seizure should have been suppressed. Accordingly, we reverse his conviction.

## I.

While conducting surveillance of the 2100 block of Main Street in the City of Lynchburg, Investigator Thomas observed two men conducting what he believed to be drug

transactions in front of the residence at 2110 Main Street. The general area was known to the officers as an open air drug market, and the residence at 2110 Main Street was a reputed crack house. Thomas relayed his observation and a description of the two suspects to members of a narcotics strike force who were waiting in a staging area nearby.

During his surveillance, Thomas observed appellant standing among a group of eight other individuals on the sidewalk in front of the residence. Thomas testified that appellant had been standing near the residence for at least fifteen minutes, but that he had not been involved in the apparent drug dealing. Thomas further stated that appellant had no contact with the two men Thomas suspected of drug dealing and that appellant had done nothing "except stand there."

Officer Duff was one of four members of the strike force responding to Thomas' call. Thomas informed Duff that the two suspects had joined the group of individuals standing in front of the residence. Duff testified that, in addition to the group on the sidewalk, approximately three other individuals were seated in a van parked at the curb and four or five others occupied the front porch area of the residence. Duff knew the area was an open air drug market, he knew shots had been fired there in the past, and, on a previous occasion, Duff had seen a pellet gun in a mailbox located only a few feet from the group on the sidewalk.

Duff testified that:

[d]ue to the nature and reputation of the area and my experience with the area and, also, some of the people that I had observed there it was our decision to place all of the people that were on the sidewalk on the ground in a prone position momentarily for our safety and their safety.... We were going to secure the two target suspects and then make the scene secure, either by having people leave or making sure that there were no weapons with the people that decided to stay.

As he approached the scene, Duff ordered the individuals on the sidewalk, including appellant, to lie on the ground in a

prone position and extend their arms. Duff testified that the officers would not have pursued anyone who chose to leave the scene other than the two suspects. He acknowledged, however, that no one left or was told they could leave.

Appellant immediately assumed a prone position as Duff ordered, but he kept his hands underneath his torso. Duff approached appellant, again ordering him to extend his arms. Appellant complied as Duff grabbed his arm and rolled him onto his right side. In search of a weapon, Duff found no weapons on the ground under appellant. Still concerned about his safety and the possibility of finding a weapon, Duff conducted a pat down search of appellant's waistline and of the left front of his pants. As a result of the search, Duff seized the cocaine used to support appellant's conviction. The trial court denied appellant's motion to suppress the cocaine, finding "that the police officers ... acted properly and had reasonable probability or reasonable basis to believe that the area involved was very dangerous; that it was a high crime area."

## II.

The Commonwealth concedes that appellant was seized within the meaning of the Fourth Amendment when Officer Duff compelled him to lie face down on the ground and extend his arms. The Commonwealth further concedes that the police officers had no reason to suspect that appellant had been engaged in criminal activity prior to his seizure. The issue on appeal is whether appellant's detention was nevertheless justified under the Fourth Amendment.

Appellant contends that his seizure was unreasonable because the officers had no reason to suspect that he was engaged in criminal activity. The Commonwealth contends that a Fourth Amendment seizure may be justified on grounds other than probable cause or reasonable suspicion of criminal activity and that the officers' actions in this case "were appropriate to protect both themselves and the bystanders from the dangers involved in a narcotics arrest."

■ Although we find few circumstances under which Fourth Amendment seizures are justified in the absence of probable cause or reasonable suspicion of criminal activity, we disagree with appellant's contention that the absence of probable cause or reasonable suspicion of criminal activity renders a police-initiated detention unlawful *per se.* *See Maryland v. Wilson,* — U.S. —, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). In *Wilson,* the Supreme Court extended the rationale of *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (holding that a police officer may, as a matter of course, order the driver of a lawfully stopped car to exit his vehicle), and held that a police officer making a traffic stop may order a passenger to exit the car pending completion of the stop, even though the officer has no reason to suspect the passenger of criminal behavior. *Wilson,* — U.S. at —, 117 S.Ct. at 886.[1] In *Summers,* the Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. at 705, 101 S.Ct. at 2595; *see also Jones v. Commonwealth,* 23 Va.App. 93, 98–99, 474 S.E.2d 825, 828 (1996). We further note that Fourth Amendment seizures, made in the absence of probable cause or reasonable suspicion of criminal activity, may be warranted under the community caretaking function of the police. *See Commonwealth v. Waters,* 20 Va.App. 285, 456 S.E.2d 527 (1995). In short, the absence of reasonable suspicion or probable cause to believe that appellant was engaged in criminal activity in the present case does not necessarily render appellant's seizure unlawful.

In support of its contention that appellant's seizure was lawful under the circumstances of this case, the Commonwealth relies, by analogy, on the seizures upheld in *Wilson*

---

1. In *Bethea v. Commonwealth,* 14 Va.App. 474, 419 S.E.2d 249 (1992), *aff'd,* 245 Va. 416, 429 S.E.2d 211 (1993), this Court earlier addressed the issue resolved by the Supreme Court in *Wilson* and reached the same conclusion.

and *Summers.* We find, however, that the Commonwealth's analogy of the present case to *Wilson* and *Summers* is misplaced.

 The touchstone of Fourth Amendment analysis is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Wilson,* —— U.S. at ———–——, 117 S.Ct. at 884–85 (citations omitted); *Summers,* 452 U.S. at 699–700, 101 S.Ct. at 2592–93; *Bethea v. Commonwealth,* 14 Va.App. 474, 476, 419 S.E.2d 249, 250 (1992), *aff'd,* 245 Va. 416, 429 S.E.2d 211 (1993). Reasonableness under the Fourth Amendment is determined by balancing the public interest against the "individual's right to personal security free from arbitrary interference by law officers." *Wilson,* —— U.S. at ——, 117 S.Ct. at 885 (citations omitted); *Summers,* 452 U.S. at 701, 101 S.Ct. at 2593 (test is "to examine both the character of the official intrusion and its justification"); *Bethea,* 14 Va.App. at 476, 419 S.E.2d at 250.

Weighing the public interest at stake in automobile stops, the *Wilson* Court thought it " 'too plain for argument' " that officer safety is a " 'legitimate and weighty' " justification. *Wilson,* —— U.S. at ——, 117 S.Ct. at 885 (quoting *Mimms,* 434 U.S. at 110, 98 S.Ct. at 333). Noting the inherent danger to police officers which exists when effecting a traffic stop, the Court declined to distinguish the threat of danger to police officers posed by drivers and that posed by passengers. *Wilson,* —— U.S. at ——, 117 S.Ct. at 885.

> It would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.

*Id.* at ——, 117 S.Ct. at 886. The Court found that the public interest in officer safety would be furthered by denying vehicle passengers access to weapons potentially concealed in the

vehicle's passenger compartment. Likewise, the *Summers* Court found officer safety to be material to its analysis.

> [T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and occupants is minimized if the officers routinely exercise unquestioned command of the situation.

*Summers,* 452 U.S. at 702–03, 101 S.Ct. at 2594. Other public interests at stake in *Summers* included the prevention of flight in the event that incriminating evidence was found, the facilitation of the orderly completion of the search and the preservation of evidence subject to the search. *Id.*

Weighing the liberty interests at stake, the Court in both *Wilson* and *Summers* found that the seizures at issue in those cases were only minimal, incremental intrusions to the intrusions already occasioned as a practical consequence of the lawful police action taken, *viz.*, the automobile stop and the execution of the search warrant. *Wilson,* —— U.S. at ——, 117 S.Ct. at 886; *Summers,* 452 U.S. at 703, 101 S.Ct. at 2594. The Court in *Wilson* found that requiring the passenger simply to exit the lawfully stopped vehicle pending completion of the stop was only a "minimal" increment to the intrusion he had already suffered as a practical consequence of the stop itself. *Wilson,* —— U.S. at ——, 117 S.Ct. at 886. Similarly, the Court in *Summers* found that the detention of the occupant of the premises lawfully searched was "only an incremental intrusion" to the intrusion he had already suffered as a practical consequence of the execution of the search warrant. *See* 452 U.S. at 701, 101 S.Ct. at 2593 ("Indeed, we may safely assume that most citizens—unless they intend flight to avoid arrest—would elect to remain in order to observe the search of their premises.").[2]

---

2. Furthermore, the *Summers* Court emphasized that the existence of the search warrant and the connection between the occupant and the premises searched provided an objective justification for the detention. *Summers,* 452 U.S. at 703, 101 S.Ct. at 2594.

On balance, the Court in both *Wilson* and *Summers* found that the incremental intrusions to the defendants' individual liberty, which had already been impinged as an inherent consequence of lawful police action taken, were outweighed by the public interests furthered by their seizures. As such, the seizures in both cases were upheld as reasonable.

The Court's Fourth Amendment balancing in both *Wilson* and *Summers* was premised on a qualitative analysis of the respective interests at stake, both public and personal. Fundamental, albeit implicit, to the Court's analysis in each case was the relationship between the defendant and the object of the lawful police action taken. The relationship between passenger and lawfully stopped vehicle and that between occupant and lawfully searched home justified the weight given to the public. interest in officer safety.[3] Moreover, the degree of the intrusion upon individual liberty at issue in each case was evaluated in relation to the initial detention the defendants suffered because of their relationship to the lawful police action taken.[4] Thus, the seizures at issue in *Wilson* and *Summers* were the additional intrusions upon individual liberty, *viz.*, the compulsion to exit the lawfully stopped vehicle and

---

[A] neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home. The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.

*Id.* at 703–04, 101 S.Ct. at 2594–95. The Court further noted that because the detention occurred in the defendant's home, "it could only add minimally to the public stigma associated with the search itself." *Id.* at 702, 101 S.Ct. at 2594.

**3.** In *Wilson* and *Summers*, the defendants' respective interests in the objects of the police activity, *viz.*, the car and the house, gave rise to concern for officer safety in the context of effecting a stop of the car and a search of the house. The same relationship gave rise to the other public interests at issue in *Summers*, *viz.*, the prevention of flight, the facilitation of the search and the preservation of evidence.

**4.** Because of the relationship, the passenger in *Wilson* was for practical purposes stopped when the vehicle was stopped, and the occupant in *Summers* was for practical purposes detained by the execution of the search warrant.

the compulsion to remain on the premises of the residence lawfully searched. Evaluated qualitatively, those seizures were found to be only minimal, incremental intrusions.

In contrast to both *Wilson* and *Summers,* the evidence in the present case fails to establish a relationship, other than geographic, between appellant and the object of the lawful police action taken, *viz.,* the arrest of the suspected drug dealers. The evidence established only that appellant was, at the time of his seizure, an innocent bystander; no evidence connected appellant to the drug transactions observed or to the suspected dealers.

### III.

In the present case, we acknowledge that the officers were justified in believing that the individuals who had been observed dealing drugs posed a serious threat to their safety.[5] However, they had no basis to believe that appellant posed such a threat. *See Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) (Each individual is "clothed with constitutional protections against an unreasonable ... seizure," which may not be denied by the individual's "mere propinquity to others independently suspected of criminal activity."); *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979) ("In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference."). A manifest distinction exists between the threat of danger posed by a criminal suspect and that posed by a nearby bystander exhibiting no suspicious criminal conduct or other behavior giving rise to the rational conclusion that he or she is in any

---

5. Indeed, we agree with the Commonwealth that there is an inherent potential for violence surrounding drug transactions and arrests, *see, e.g., Logan v. Commonwealth,* 19 Va.App. 437, 445, 452 S.E.2d 364, 369 (1994) (*en banc* ), and we recognize and are bound by the trial court's finding that the officers in the present case reasonably believed that they faced a "very dangerous" situation. *See Ornelas v. United States,* — U.S. ——, ——, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996).

way associated with the suspect. In short, the threat appellant posed to officer safety cannot be equated to the weighty justifications present in *Wilson* and *Summers.*

Furthermore, appellant had not already suffered an intrusion upon individual liberty as a practical consequence of lawful police action; thus, the seizure at issue in the present case cannot be described as a mere "incremental" intrusion. Rather, appellant was an innocent bystander when he was compelled to lie face down on the ground with his arms extended as the police approached to arrest two individuals with whom he was not associated other than by geographic proximity. We disagree with the Commonwealth's contention that the intrusion on appellant's liberty in the present case was commensurate with the *de minimis,* incremental intrusions at issue in *Wilson* and *Summers.* A patent qualitative difference exists between the incremental intrusions at issue in *Wilson* and *Summers* and the intrusion suffered by appellant.[6]

■ Officer safety is without question a legitimate and weighty justification for police action which intrudes on individual liberty, but it must be considered in relation to the particular liberty interests sacrificed. *See Bethea,* 14 Va.App. at 477, 419 S.E.2d at 251 ("Whether the actions of the officer are reasonable depends on the facts and circumstances of each case."). Indeed, as both *Wilson* and *Summers* make clear, the inherent potential for violence that police officers routinely face does not alone justify whatever action they take in the course of their duties. On balance, we find that the significant intrusion upon the liberty of the appellant in this case, an individual who had not associated himself in any respect other

---

6. We do not hold that an intrusion on the liberty interests of bystanders at an arrest scene necessarily violates the Fourth Amendment. Each case must be decided on its own unique facts, and we recognize that the liberty interests of surrounding bystanders may be impacted when police officers take lawful action in a crowded, public place. Contrary to the Commonwealth's suggestion, however, the bystander in the present case was not simply asked to "step aside" so that the officers could arrest the suspected drug dealers.

than geographically with the subject of police action, cannot be justified under the Fourth Amendment.[7] The cocaine recovered as a result of appellant's seizure should have been suppressed.[8]

Accordingly, we reverse appellant's conviction and order the charge dismissed. *See Alexander v. Commonwealth,* 19 Va. App. 671, 672, 454 S.E.2d 39, 40 (1995).

*Reversed and dismissed.*

BENTON, Judge, concurring.

I concur in Parts I and III, except for footnote 7. Therefore, I concur in the judgment reversing the conviction and dismissing the indictment.

DUFF, Judge, dissenting.

I must respectfully dissent from Part III of the majority opinion.

In my view, the appellant was not unlawfully seized under the circumstances facing the police officers at the time of the encounter. The majority properly acknowledges that officer safety is a legitimate and weighty justification for police action which intrudes on individual liberty. They also recognize that an intrusion on the liberty of bystanders at an arrest scene does not necessarily violate the Fourth Amendment. I agree

---

7. In support of its argument that appellant's seizure was justified in the interest of his own protection, the Commonwealth urges the application of a "public safety" exception to the Fourth Amendment. Although the Commonwealth fails to develop this argument, we presume, *arguendo,* that it would find support in the application of the community caretaking function of the police. The community caretaker exception, however, requires, *inter alia,* that the intrusion be "limited." *Waters,* 20 Va.App. at 290, 456 S.E.2d at 530. Even assuming the doctrine would support police action taken to secure an arrest scene in the interest of public safety, we believe it can scarcely be said that the intrusion upon appellant's liberty in the present case was limited.

8. Because we find appellant's seizure to have been unreasonable, we find it unnecessary to address either the subsequent search or the sufficiency of the evidence.

with the majority's assertion that "[e]ach case must be decided on its own unique facts, and ... that the liberty interests of surrounding bystanders may be impacted when police officers take lawful action in a crowded, public place."

The unique facts of this case, as shown by the record, are the following: The residence at 2110 Main Street was an open air drug market; between January 1994 and August 11, 1995, the police had received 703 calls from the 2100 block of Main Street; 136 of these calls involved drug offenses; 68 of the drug offense calls *directly involved 2110 Main Street.*

The record further shows that the officer had personally seen a black handgun in the mailbox of 2110 Main Street some months before the incident involved herein. The gun ultimately proved to be a pellet gun. However, during the time period mentioned above, seventeen "shot-fired" calls had been received from the immediate area. The seven or eight individuals who were ordered to lie on the ground were in the immediate proximity of the two target subjects. In fact, appellant was "about five feet" from them and only three or four feet from the mailbox where the officer had previously seen the gun.

The combination of these circumstances, particularly the tight grouping around the target subjects, leads me to the same conclusion as that reached by the trial court, *viz.,* that the action taken by the officer was reasonable and appropriate to insure not only police safety but also that of the other bystanders shown by the record to have been in the area.

As stated in *Michigan v. Summers,* 452 U.S. 692, 702–03, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981), these facts describe

> the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm ... is minimized if the officers routinely exercise unquestioned command of the situation.

I recognize that more intrusive police conduct may be sanctioned when the encounter occurs inside a residence than on the open street. However, circumstances such as those

**612**

revealed by the record before us make the potential for violence just as real and just as deadly should it erupt. In *United States v. Fountain,* 2 F.3d 656, 666 (6th Cir.1993), an unidentified person found at the scene of a search was handcuffed and ordered to lie on the floor during the search. The intrusion, although more extensive than here, was held to be reasonable.

For these reasons I must respectfully dissent.