OPINION
Virgil Roy Lee IV was indicted on one count of possessing crack cocaine in an amount exceeding 100 grams and one count of escape. After his motion to suppress evidence was overruled, Lee entered a no contest plea to the possession count and was found guilty. The escape count was dismissed. The trial court sentenced Lee to three years imprisonment and suspended his driver's license for six months. On appeal, Lee asserts as error the adverse ruling on his motion to suppress.
The evidence at the suppression hearing consisted of the testimony of Dayton Police Officers Timothy Braun and David House.
According to the testimony, Braun and his partner, Officer Gaier, were in their cruiser January 12, 2000, at Gettysburg and Prescott Avenues in Dayton, at about 5:30 p.m. They were on the lookout for a green Dodge Intrepid automobile with a certain license plate number. They had been told by a reliable, confidential informant that the car might "possibly" have been involved in a drug transaction and be transporting drugs. These officers observed a car fitting the description they had been given northbound on Arlene Avenue. They followed the car and observed it make an unsignaled left turn onto Hillcrest Avenue. They eventually stopped the car for this traffic violation on Kipling Drive. Brown and Gaier approached the stopped car:
 Q. Did you notice anything while you were walking up to the vehicle?
 A. Actually, right when we stopped it, just movements in the car, turning around, heads ducking down, arms going out of sight, just furtive movements as we walked up, so the information that we had and those movements after the vehicle stopped just as we walked up, we immediately told all the occupants to show us their hands.
Q. Why did you do that?
 A. For our safety, not knowing if they had any weapons at that point.
 Q. You indicated some of the individuals were ducking their heads and moving their hands. Which ones were doing that?
 A. Pretty much all of them. The back seat person behind the driver was the least one actually moving around. The driver, the front seat passenger, and Mr. Lee were all bending over, moving, turning around.
Officer David House arrived at the scene to back up Braun and Gaier. Gaier required the driver, Marlin Stewart, to exit the vehicle. After patting down Stewart, Gaier placed him in his and Braun's cruiser. Braun required the front seat passenger, Derrick McGuire, to exit the car. He ran McGuire's information on the cruiser computer and found no wants or warrants. He put McGuire, who was not handcuffed, into House's cruiser. At the same time that Braun was checking out McGuire, House ordered Lee out of the right rear back seat of the car and patted him down. House was aware of the information imparted to Braun and Gaier by the informant, having himself spoken to the informant. He observed Lee's hands drop from the front seat headrest and disappear "behind the backseat."[1] He observed Lee pulling his right hand out of a "large storage pouch" on the back of the front seat. House could not see what was inside the pouch. He was concerned that Lee was secreting or retrieving a weapon and feared for his safety, because the stop was made in a "high drug area," and the combination of drugs and guns are a common occurrence. House removed Lee from the car to eliminate his access to any weapon in the car, and patted him down for weapons on his person. When House reached Lee's right pants pocket, he felt two small hard square objects that his experience told him were crack cocaine. House could also tell the objects were in a plastic baggie. After House completed the pat down, he asked Lee what was in his pocket, to which Lee replied "just a little weed, if anything." House immediately took the baggie containing suspected crack out of Lee's pocket and arrested him for possession of crack cocaine. House handcuffed Lee and put him on the rear passenger seat of his cruiser, next to the uncuffed McGuire, who was behind the driver seat.
Braun told House that McGuire could be released because of the lack of wants or warrants or other basis for continued detention, but then they observed McGuire and Lee engaged in movements in the rear seat that were indicative of an attempted transfer of something from one to the other. Both men were removed from the cruiser. Braun patted down McGuire again, and House searched Lee because he was now under arrest. Neither the pat down nor the search produced a weapon or other contraband.
McGuire and Lee were returned to the rear of House's cruiser, and House got into the driver seat to check out Lee on the computer. Lee and McGuire resumed movements indicative of an attempt to transfer something. House exited his cruiser. McGuire and Lee got out of the cruiser and attempted to get away, but House was able to grab them both, and both were subdued with the assistance of Gaier and Braun.
Lee was returned to House's cruiser. As McGuire and Lee were being subdued, two more officers — Steve Bergman and Jim Goodwill — arrived at the scene. Goodwill alerted House to Lee.
 Q. Based on your conversation with Mr. Goodwill, what did you do?
 A. I looked to the back seat of my cruiser, at which time I observed Mr. Lee, who is sitting on his knees on the back seat looking out the back window toward us. We were standing near the trunk of my cruiser. Mr. Lee was on his knees looking out, the hands still behind the back, and it observed or appeared he was trying to get something out of the back of his coat.
 Q. What did you do when you observed Mr. Lee doing that?
 A. Officer Goodwill, who was standing next to me, immediately went around to the passenger side of my cruiser, which is the portion where Mr. Lee's back was exposed to or turned to and he opened that door.
Q. Where were you at this point?
 A. I followed around with Officer Goodwill. However, I was behind Officer Goodwill.
Q. What did Officer Goodwill do?
 A. As soon as Officer Goodwill opened my back door, Virgil Lee spun around in the seat pinning his hands in the back of the seat against the back of my cruiser seat and the opposite corner of the cruiser itself.
Q. What did Officer Goodwill do at that point?
 A. Officer Goodwill ordered Lee to show him his hands, which he refused. He then wedged his hand behind Mr. Lee's back and back seat of the cruiser and attempted to gain control of Mr. Lee's hands and turn him so we could expose his back to see if he had anything behind him. At the same time, Officer Goodwill reached to grab the handcuffs with his left hand. He placed his right hand in the area between the shoulder blades of Mr. Lee's back to assist in turning him. When he did this, he placed his hand over a very large bulge, which was in the back of Mr. Lee's coat. Also, as I stated, he was wearing cuffs. The coat came down off of his shoulders and was sort of like this.
 Q. For the record you're indicating that the jacket was actually going down past his shoulders onto his arms?
A. Yes, it had.
Q. Did you observe anything?
 A. I observed Officer Goodwill pushing his hand near the back of Mr. Lee's back and in fact he forced a red and white Old Navy shopping bag out of the top of Mr. Lee's coat.
 Q. Okay. What did Officer Goodwill do with that bag?
 A. Officer Goodwill was still in the back seat of the cruiser with Mr. Lee. He immediately turned around, handed the bag out to me, or the bag, where I was standing outside the cruiser door.
 Q. Could you describe to the Court the bag how big it was and what it looked like?
 A. It was an Old Navy shopping bag, red and white, approximately I would guess twelve inches by maybe eighteen inches. It was tied into a knot at the top and it had a very large bulge in the bottom portion of the bag.
Q. What did you do with the bag?
 A. I immediately opened the bag and looked inside, and when I looked inside I saw numerous individual baggies that each contained what appeared to be a large quantity of crack cocaine.
Q. Did you eventually count how many bags there were?
A. There were ten separate sandwich baggies.
 Q. Could you describe what the substance in the bag looked like?
A. They were large.
Q. Describe its characteristics?
 A. Yes. They were large chunks. Again white to off white in color which resembled crack cocaine. Each separate baggy had an approximate weight of approximately twenty-five grams.
There were no items in the rear of House's cruiser when he arrived at the scene of the traffic stop. The driver, Marlin Stewart, was charged with a failure to signal violation for which he paid a $44 fine.
The trial court properly overruled the motion to suppress.
Officers Brown and Gaier permissibly stopped the car in which Lee was riding because of the unsignaled left turn. Dayton v. Erickson (1996),76 Ohio St.3d 3, syllabus. It was also permissible to order Lee, a passenger, out of the car. Maryland v. Wilson (1997), 519 U.S. 408; State v. Watson (Aug. 23, 1996), Montgomery App. No. 15449, unreported.
Likewise, Officer House permissibly conducted a pat down of Lee's person after he exited the car based upon a reasonable, articulable suspicion that Lee was armed. Terry v. Ohio (1968), 392 U.S. 1. House was personally familiar with the information from the reliable confidential informant. The stop had been made in a "high drug area," and the combination of drugs and guns is a common occurrence. House had observed movements by Lee suggestive of hiding or retrieving a weapon. Based on these factors, House feared for his safety.
The seizure of the two pieces of crack cocaine can be justified under two alternative theories. The trial court relied on the "plain feel" doctrine enunciated in Minnesota v. Dickerson (1993), 508 U.S. 366. The evidence supports reliance on this doctrine. On appeal, the State relies on Lee's response to House's question about what was in his pocket — "just a little weed, if anything" — as justification for the removal of what turned out to be crack cocaine. Although Lee did not admit to possessing crack cocaine, he did admit to possessing contraband drugs. It was not necessary during this investigative detention that House Mirandize Lee before asking him what was in his pocket, and Lee's answer furnished probable cause for seizure of what turned out to be crack cocaine. See State v. Healy (Aug. 4, 2000), Montgomery App. 18232, unreported.
House lawfully arrested Lee for possession of crack cocaine. Because Lee was lawfully under arrest for possession of the crack cocaine retrieved from his pants pocket, he was subject to a search of his person as an incident of that lawful arrest. Chimel v. California (1969),395 U.S. 752. In State v. Myers (1997), 119 Ohio App.3d 376 at 380, following Chimel, we stated that the twofold reason for permitting a warrantless search incident to a lawful arrest is to deny the arrestee access to weapons and to deny the arrestee access to evidence which he might conceal or destroy. Although House searched Lee after he was removed from the cruiser after he and McGuire appeared to be attempting to pass something from one to the other, their continued similar movements — after they were returned to the cruiser — coupled with Lee's movements in the cruiser after the unsuccessful escape attempt justified a further search of Lee's person. Thus, the Old Navy bag containing the ten baggies of crack cocaine, which this further search uncovered, was properly seized.
The motion to suppress was properly overruled. The assignment of error is overruled.
The judgment will be affirmed. The stay of sentence pending appeal, granted by the trial court, will be vacated.
FAIN, J. and GRADY, J., concur.
[1] From the context of his testimony, House may have actually said "bucketseat."