SHARP, W, J.
C.Q. appeals from an order which committed him to a level six commitment program after he pled no contest to charges of possession of less than 20 grams of cannabis,[1] and possession of drug paraphernalia,[2] both of which are first degree misdemeanors. Prior to entering his plea, C.Q. filed a motion to suppress the evidence seized prior to and during his arrest, claiming his state and federal constitutional rights to be free from unreasonable searches and seizures had been violated.[3] The trial court found no constitutional violations in this case. The evidence was dispositive and C.Q. reserved his right to appeal the ruling.[4] After a review of the record in this case, we agree with C.Q. that the evidence should have been barred as having been obtained as a result of an illegal search and seizure.[5]
In reviewing this case, we must give credence to the testimony which supports the trial court’s rulings, as it is the finder of fact.[6] Thus, if there is a dispute in the evidence, with competent substantial *306 evidence to support both sides, the trial court’s interpretation is determinative, as far as the reviewing court is concerned. Hines v. State, 737 So.2d 1182 (Fla. 1st DCA 1999). However, the trial court’s application of the law to the facts is reviewed by the appellate court de novo. See, e.g., Connor v. State, 803 So.2d 598 (Fla.2001); State v. D.J., 796 So.2d 1217 (Fla. 4th DCA 2001); State v. Parrish, 731 So.2d 101, 103 (Fla. 2d DCA 1999).
Based on that analysis, the record in this case demonstrates the following. Detective Freeman was called to a parking lot near an Albertson’s by a C.O.P. (Citizens on Patrol) unit, because a car was parked illegally in a fire lane at the store. It was the middle of the day and not in a high crime area. The driver had been told to move the car. He had been waiting to pick-up a friend from work at Subway.
Freeman saw that the car contained a driver and three passengers. The driver moved the car and parked legally. Freeman got out of his patrol car and asked the driver why he had parked there. He made small talk with him. Freeman asked if he could search the car and the driver consented. Then, Deputy Borows arrived in response to the same radio transmission.
All four occupants of the car were asked to get out of the car. The driver remained close to Freeman. The three passengers were told to step over to an island in the parking lot, and all complied. Freeman searched the car and found no contraband.
Borows asked the first passenger whether he had a weapon, and he said no. Bo-rows asked him if he could “check.” He patted him down and said “fine” to him. Next he turned to C.Q. He asked him if he had a weapon, and C.Q. said no. He also asked him if he could “check.”
Deputy Borows testified:
He had a cap on. I asked him if he had anything under his cap, he said no. He took the cap off, shook it. I asked him if I could see it, he handed it to me. I checked the band around the cap. There was nothing in it. Handed it back to him.
I asked him again are you sure you don’t have anything on you that would ... hurt me in any way, he said no. I said do you mind if I check, he said no. I did a pat down. When I got to his right change pocket I could feel something in there but I could not identify by feel.
I asked him what he had in his pocket and he said lighters. I said could I see them. And he reached into his pocket and handed me a couple of lighters. I could still see there was a bulge of some type in that pocket. I said what else do you have in there, he said a lighter. And then I said could I see it, and at this point he pulled out the pipe and handed it to me.
' Because the pipe smehed of marijuana, C.Q. was arrested. After being transported to the detention center, he disclosed that he had marijuana in his shoe.
The state characterizes the situation in this case as being a type of Terry stop,[7] or a temporary investigative stop, during which a frisk for weapons is permitted. But such a stop requires the police to have a well-founded, articulable suspicion of criminal activity.[8] There is no basis in this record to conclude that C.Q. or the others were involved in any kind of crimi *307 nal activity. C.Q. was merely a passenger in a car which had been illegally parked in a fire lane — a traffic offense for the driver.[9]
Once the driver consented to a search of the car, it is clear the deputies could ask the passengers to step out and away from the vehicle while it was being searched.[10] The deputies could not, without probable cause, restrict the movements of the passengers. C.Q. testified he did not feel free to leave the island where he had been directed to stand. The deputies testified otherwise.
Assuming that C.Q.’s contact with Deputy Borows on the parking lot island was “consensual,”[11] as testified to by the deputies, the lawfulness of C.Q.’s pat down is critical. There is no evidence in this record that the deputies had any reason to believe C.Q. or any other occupant of the car, was armed with a weapon or that they had such a belief. Absent a knowing and voluntary consent, Deputy Borows had no right to conduct a pat down or to ask C.Q. to remove anything from his pockets. See Terry; State v. Webb, 398 So.2d 820 (Fla.1981) (reasonable belief person armed with dangerous weapon required to frisk); Harris v. State, 574 So.2d 243 (Fla. 1st DCA 1991); § 901.151(5), Fla. Stat. (2000). Police may not lawfully conduct pat-down searches based merely on routine or generalized safety concerns. Augustus v. State, 773 So.2d 104 (Fla. 5th DCA 2000).
The state argues that C.Q. consented to a pat down for weapons, and that this consent obviates the requirement that law enforcement officers must have a reasonable suspicion that the person is armed. C.Q. denies he consented to the pat down. The trial court believed the deputy. However, even if C.Q. consented, Borows exceeded the scope of the search. Borows testified he felt something hard in C.Q.’s pocket, but he did not testify that he thought it was a weapon. He then ordered C.Q. to remove the lighters from his pocket, which he did. Seeing still another bulge, Borows ordered the yet to be discovered pipe to be withdrawn. But again, he did not testify he believed the bulge was a weapon, nor do the surrounding facts of this case indicate he could have had such belief.
Borows’ demand that C.Q. empty his pockets exceeded the scope of a lawful protective frisk for weapons, even had C.Q. consented to a weapon search. See Thomas v. State, 644 So.2d 597 (Fla. 5th DCA 1994); Harris; K.L. v. State, 699 So.2d 819 (Fla. 1st DCA 1997); Pirri v. State, 428 So.2d 285 (Fla. 4th DCA 1988).
Accordingly, we reverse the order below which adjudicated C.Q. guilty of the misdemeanors and committed him to a level six commitment program.
HARRIS and PETERSON, JJ., concur.

. §§ 893.03(l)(c)(7), 893.13(6)(a) and (b), Fla. Stat. (2000).

. §§ 893.145(12), 893.147(l)(b), Fla. Stat. (2000).

. U.S. Const. Amend. IV; Fla. Const, art. 1, § 12.

. See §§ 924.051(4), 924.06(3), Fla. Stat. (2000); Amendment to Fla. Rules Criminal and Appellate Procedure, 2001 WL 1276878 (Fla. Oct. 18, 2001) (Rule 9.140(b)(2)(A)(i)); Blanco v. State, 752 So.2d 79 (Fla. 2d DCA 2000).

. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); State v. White, 660 So.2d 664, 665 (Fla.1995).

. Murray v. State, 692 So.2d 157, 159 (Fla.1997); State v. Shaw, 784 So.2d 529 (Fla. 1st DCA 2001); Garner v. State, 729 So.2d 990, 992 (Fla. 5th DCA 1999).

. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. King v. State, 696 So.2d 860, 861 (Fla. 2d DCA 1997); Lang v. State, 671 So.2d 292, 293 (Fla. 5th DCA 1996).

. §§ 316.1945(4), 318.14, Fla. Stat. (2000).

. See Maryland v. Wilson, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).

. See Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).