J-S38036-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| RONDELLE CHRISTIAN MIDDLETON, | : | |
| | : | |
| Appellant | : | No. 1761 MDA 2014 |

Appeal from the Judgment of Sentence entered on September 12, 2014
in the Court of Common Pleas of Dauphin County,
Criminal Division, No. CP-22-CR-0000012-2014

BEFORE: WECHT, STABILE and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                **FILED JULY 16, 2015**

Rondelle Christian Middleton ("Middleton") appeals from the judgment of sentence imposed after he was convicted of possession with intent to deliver a controlled substance, possession of a controlled substance, and possession of drug paraphernalia.[1]  We affirm.

The trial court set forth the procedural history and relevant facts underlying this appeal in its Pa.R.A.P. 1925(a) Opinion, which we incorporate herein for purposes of this appeal.  **See** Trial Court Opinion, 2/18/15, at 1-5.

On appeal, Middleton presents the following issue for our review:

Whether the trial court erred in denying [Middleton's] Suppression Motion where police officers conducted a suspicionless **Terry**[FN] frisk and a coerced consent search of [Middleton], in violation of Article I, Section 8 of the

---

[1] **See** 35 P.S. § 780-113(a)(30), (16), and (32).

> Pennsylvania Constitution and the Fourth Amendment to the United States Constitution?
>
> [FN] ***Terry v. Ohio***, 392 U.S. 1 (1968).

Brief for Appellant at 5 (footnote in original).

> In reviewing the denial of a suppression motion,
>
> our role is to determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings. In making this determination, we may consider only the evidence of the prosecution's witnesses and so much of the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the evidence supports the factual findings of the suppression court, we may reverse only if there is an error in the legal conclusions drawn from those factual findings. As a reviewing court, we are therefore not bound by the legal conclusions of the suppression court and must reverse that court's determination if the conclusions are in error or the law is misapplied.

***Commonwealth v. Page***, 59 A.3d 1118, 1131 (Pa. Super. 2013) (citation and brackets omitted).

Middleton argues on appeal that the ***Terry*** frisk of his person was unlawful, as it was not supported by reasonable suspicion that he was armed and dangerous.[2] ***See*** Brief for Appellant at 12-15 (citing, *inter alia*, ***Commonwealth v. E.M.***, 735 A.2d 654, 659 (Pa. 1999) (stating that "[i]n order to justify a frisk under ***Terry***, the officer must be able to point to particular facts from which he reasonably inferred that the individual was

---

[2] We observe that Middleton does not dispute that the initial stop of the vehicle driven by King was lawful, nor does he challenge that the police possessed the requisite reasonable suspicion/probable cause to conduct a ***Terry*** frisk of King and/or arrest him.

armed and dangerous.") (citation and quotation marks omitted)); **see also** Brief for Appellant at 13 (asserting that "Officer Henry was unable to point to any fact from which he reasonably inferred that [Middleton] was armed and dangerous. Indeed, Officer Henry conceded that his basis to search [Middleton] was what he *didn't* know, not what he did know[.]" (emphasis in original)). Importantly, Middleton never raised this claim before the trial court;[3] accordingly, we must rule that it is waived. **See** Pa.R.A.P. 302(a) (stating that an issue cannot be raised for the first time on appeal); **see also Commonwealth v. Miller**, 80 A.3d 806, 811 (Pa. Super. 2013) (stating that "[b]y requiring that an issue be considered waived if raised for the first time on appeal, our [appellate C]ourts ensure that the trial court that initially hears a dispute has had an opportunity to consider the issue. This jurisprudential mandate is also grounded upon the principle that a trial court must be given the opportunity to correct its errors as early as possible.") (citation and ellipses omitted);[4] **see also Commonwealth v. Colavita**, 993 A.2d 874, 891 (Pa. 2010) (stating that "[w]here the parties

---

[3] In his Motion to Suppress and supporting Memorandum of Law, Middleton challenged only the validity of his consent to the search of his person (performed after the **Terry** frisk), and the allegedly coercive atmosphere in which he consented to the search.

[4] The trial court in the instant case correctly observed in its Pa.R.A.P. 1925(a) Opinion that "[u]pon review of the suppression hearing transcript and Memoranda of Law submitted by the parties, it appears that both parties agree that the **Terry** frisk performed by Officer Henry [on Middleton] was a lawful investigative detention[,] and the encounter is not being challenged as illegal." Trial Court Opinion, 2/18/15, at 6.

- 3 -

fail to preserve an issue for appeal, the Superior Court may not address that issue *sua sponte*.") (citation omitted).

Moreover, Middleton did not specifically challenge the **Terry** frisk in his court-ordered Pa.R.A.P. 1925(b) Concise Statement.  Instead, he raised only a general challenge to the trial court's denial of his suppression Motion.[5] **See** Pa.R.A.P. 1925(b)(4)(ii) & (vii) (providing, respectively, that "[t]he Statement shall concisely identify each ruling or error that the appellant intends to challenge *with sufficient detail to identify all pertinent issues for the judge*[,]" and that "[i]ssues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.") (emphasis added).

Next, we address Middleton's challenge to the legality of the search of his person that occurred after the **Terry** frisk, and whether his consent to this search was voluntarily given.  According to Middleton, his "alleged consent to Officer Hammer's search of his person was coerced and the product of deception."  Brief for Appellant at 23.  Middleton avers that he

> did not … voluntarily consent to the search[,] since he was continuously and illegally subjected to the will and control of Officer Henry.  Officer Henry had previously pulled out his gun, pointed it at [Middleton], and gave [him] numerous orders[,] which [he] obeyed.  [Middleton] testified that he thought he would get in trouble if he disobeyed.

---

[5] Middleton raised the following claim in his Concise Statement:  "The trial court erred when it denied [Middleton's M]otion to suppress evidence and statements in the above captioned case."  Concise Statement, 10/24/14.

- 4 -

*Id.* at 24.  Middleton emphasizes that the police did not inform him that he was under no obligation to consent to the search of his person.  *Id.* at 26. Moreover, Middleton contends that "[t]hough Officer Henry testified that he told [Middleton] he was 'good to go' after determining that there were no warrants for [Middleton], Officer Henry did not mention this anywhere in his detailed and chronological police report."  *Id.* at 24.

In its Pa.R.A.P. 1925(a) Opinion, the trial court thoroughly addressed Middleton's claims, set forth the applicable law, and determined that it properly denied Middleton's suppression Motion because, *inter alia*, (1) "Officer Henry's detention for a pat-down [search] was lawful"; (2) "Officer Hammer's ID check was lawful"; and (3) Middleton voluntarily gave his consent to the subsequent search of his person, during a "constitutionally sound encounter" under the totality of the circumstances.  *See* Trial Court Opinion, 2/18/15, at 6-8, 9-13.  Our review confirms that the trial court's thorough and cogent analysis is supported by the record and the law. Therefore, we affirm on this basis in concluding that the trial court properly denied Middleton's Motion to suppress.  *See id.*[6]

Judgment of sentence affirmed.

---

[6] As an addendum, to the extent that Middleton challenges the credibility of Officer Henry's trial testimony that he had informed Middleton, after the *Terry* frisk, that he was "good to go," it was the sole province of the trial court, as the fact-finder, to evaluate Officer Henry's credibility and determine whether there were any conflicts between his testimony and his police report.  *See Commonwealth v. Vogelsong*, 90 A.3d 717, 719 (Pa. Super. 2014) (stating that "[a]s an appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record.").

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/16/2015

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
: DAUPHIN COUNTY, PENNSYLVANIA
v. :
: DOCKET NO. 0012 CR 2014
RONDELLE C. MIDDLETON : (1761 MDA 2014)

## MEMORANDUM OPINION

Rondelle C. Middleton ("Appellant" or "Middleton") is appealing his judgment of sentence entered on September 12, 2014. This opinion is written pursuant to Pa.R.A.P. 1925(a).

## PROCEDURAL HISTORY

In January 2013, Appellant, Rondelle C. Middleton, was arrested and charged with one count each of Possession With Intent to Deliver a Controlled Substance,[1] Possession of a Controlled Substance,[2] and Possession of Drug Paraphernalia.[3] He filed an Omnibus Pretrial Motion to Suppress Evidence which this Court denied on July 21, 2014. On September 3, 2014, Appellant elected to proceed with a non-jury trial after the necessary waiver colloquy was conducted on the record. Appellant was found guilty on all counts and sentenced to a thirty (30) to sixty (60) months term of incarceration at Count One (1), a sixteen (16) to thirty-two (32) months term of incarceration at Count Two (2), consecutive to Count One (1), and a six (6) to twelve

---

[1] 35 P.S. §780-113(a)(30).
[2] 35 P.S. §780-113(a)(16).
[3] 35 P.S. §780-113(a)(32).

6-14

(12) months term of incarceration at Count Three (3) concurrent to Count Two (2). Upon consideration of Appellant's Motion to Modify Sentence, this Court granted his requested relief by modifying his sentence so that term of incarceration at Count Two (2) would run concurrent with the sentence at Count One (1). However, upon reconsideration as requested by the Commonwealth, this Court reinstated the original sentence.

On October 17, 2014, Appellant timely filed a Notice of Appeal to the Superior Court of Pennsylvania. In compliance with an October 24, 2014 Order, Appellant filed a Concise Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b) raising the following issues:

> 1.      The trial court erred when it denied Appellant's motion to suppress evidence and statements in the above captioned case.

For the reasons set forth below, this Court finds that Appellant's claim of error is without merit as his Suppression Motion was properly denied.

## FACTUAL BACKGROUND

On Jan. 10, 2013 around 11:30 p.m., Corporal Tyron Meik ("Cpl. Meik") of the Harrisburg Bureau of Police ("HBP") was searching for Vernon King, a fugitive wanted on an outstanding drug charge. (Notes of Testimony, Suppression 6/5/14 at 6-7).[4] Acting on information obtained from a confidential informant, Cpl. Meik began following a blue Chrysler Pacifica automobile as it pulled out of a gas station at Sixth and Maclay Streets, Harrisburg City. (N.T. at 7). Cpl. Meik could see two males in the vehicle, one resembling a picture of Vernon King. (N.T. at 7-8). While following the vehicle, Cpl.

---

[4] Hereinafter "N.T."

2

Meik radioed other units with his location and his belief that the fugitive he was looking for was in the vehicle. (N.T. at 8).

The vehicle stopped in the 1500 block of Swatara Street, where Cpl. Meik passed it, shined his spotlight into the car and observed Mr. King in the driver's seat. (N.T. at 9; 18-19). Cpl. Meik exited his vehicle with his K-9 partner and proceeded to the front of the stopped vehicle, at which time Appellant immediately exited from the passenger side. (N.T. at 9-10). Appellant stayed in his general location while Cpl. Meik spoke with Mr. King and took him into custody. (N.T. at 9-11; 21).

Officer Brian Henry ("Officer Henry"), Officer Joshua Hammer ("Officer Hammer") and Officer Yost ("Officer Yost") arrived at the scene based on Cpl. Meik's radio request for assistance in arresting a wanted fugitive he had located. (N.T. at 12; 32). Officer Henry, a patrol Officer with the HBP, saw Appellant get out of the car that was stopped. As he did not know which individual was the fugitive, Officer Henry exited his police cruiser and ordered Appellant at gunpoint to put his hands on the car while he conducted Terry frisk[5] for weapons. (N.T. at 32-33). Appellant placed his hands on the car, so Officer Henry holstered his weapon and conducted a pat-down. (N.T. at 34-35; 38-30). Appellant remained with Officer Henry by the police vehicle while Cpl. Meik interacted with Mr. King. (N.T. at 40).

Officer Hammer arrived shortly after Officer Henry. As both Cpl. Meik and Officer Hammer were on the HBP Street Crimes Unit, Officer Henry handed over the responsibility for any further investigation. (N.T. at 36). Since Officer Henry was with

---

[5] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1969).

3

Appellant, Officer Hammer asked Cpl. Meik for further instructions regarding the crime investigation. Cpl. Meik requested that Officer Hammer run Defendant's name through NCIC to determine whether he was wanted on any outstanding warrants or detainers, as Meik knew he was on state parole. (N.T. at 12-13; 42). Appellant complied with Officer Hammer by supplying his OLN card and driver's license. (N.T. at 42). Appellant was not wanted by the police for anything, so Officer Hammer told Appellant he was "good to go"; however, Appellant stayed and continued to ask questions about his friend, Mr. King. (N.T. at 42-43).

Officer Hammer then asked for permission to search Appellant and he responded by nodding his head yes and putting his hands in the air. (N.T. at 43-44). Officer Hammer recovered two white capsules in the right front quarter pocket of Appellant's pants. (N.T. at 44). Officer Hammer reported to Cpl. Meik what he had recovered during the search of Appellant. (N.T. at 13). Cpl. Meik again made contact with Appellant as he detained him, read him his Miranda[6] rights and handcuffed him. (N.T. at 13; 45). Appellant confirmed that he understood his rights and proceeded to tell Cpl. Meik that the pills were Ecstasy, so he was placed in the back of a police unit. (N.T. at 13-14).

Once Mr. King was detained based on the outstanding warrant, he was also seated in the police unit while Cpl. Meik conducted an inventory search of the vehicle, as it was going to be forfeited to the drug task force. (N.T. at 15). During that search, pieces of crack cocaine were discovered underneath the passenger side seat, which prompted Meik to return to the police unit, read Mr. King his Miranda rights and also tell

---

[6] Miranda v. Arizona, 684 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4

Appellant that he will face charges related to the crack cocaine. (N.T. at 15-16). This prompted Mr. King to tell Meik that the crack cocaine was his. (Id.) A scale was also found in the driver's side door. (Id.)

Cpl. Meik was very familiar with Appellant from prior police interactions. (N.T. at 16). Meik knew from his past encounters with Appellant that he had transported illegal narcotics in his groin or buttocks area at least once before. (Id.) Based on the drugs he found in the car, Meik instructed Officer Yost to pull out Appellant's pants and look down the back of them. (Id.) As Cpl. Meik and Officer Hammer were in close proximity, Officer Yost pulled the back of Defendant's pants out, reached in and pulled out a baggie containing crack cocaine. (N.T. at 16-17; 45). This took place on the street with no clothing removed. (N.T. at 45-46). Once Appellant and Mr. King were transported to the booking center, both men were strip searched by Officer Hammer, at which time another baggie of crack cocaine fell from Appellant's pants. (N.T. at 46-47).

## DISCUSSION

At the suppression hearing, Appellant argued that the evidence and statements obtained subsequent to Officer Hammer's search were illegally obtained in violation of his constitutional rights, as the consent provided was not voluntary. The Commonwealth countered this position by arguing that Officer Henry's initial encounter with Appellant was a lawful investigative detention and based on the totality of the circumstances surrounding the subsequent interaction between Officer Hammer and Appellant, voluntary consent to search was indeed provided.

5

When a trial court denies a defendant's suppression motion and the ruling is challenged on appeal, the Superior Court applies the following standard of review:

> In considering the denial of a suppression motion, our standard of review is well-settled. We must "determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from these findings." *Commonwealth v. Ayala,* 791 A.2d 1202, 1207 (Pa.Super. 2002). In doing so, we "may consider only the prosecution's [evidence]" and the defendant's evidence to the extent it is not contradictory. *Id.,* 791 A.2d at 1207. If the evidence presented at the suppression hearing supports these findings of fact, we may not reverse the lower court unless its accompanying legal conclusions are in error. *See Commonwealth v. Lohr,* 715 A.2d 459, 461 (Pa.Super.1998). <u>Commonwealth v. By</u>, 812 A.2d 1250, 1254 (2002).

Upon review of the suppression hearing transcript and Memoranda of Law submitted by the parties, it appears that both parties agree that the *Terry frisk* performed by Officer Henry was a lawful investigative detention and the encounter is not being challenged as illegal. However, Appellant contends that the subsequent interaction with Officer Hammer was an unlawful warrantless investigatory detention without reasonable suspicion despite Appellant's consent because the consent was invalid. Appellant more specifically argues that the consent given was not unequivocal, specific and voluntary under the circumstances so it did not validate the otherwise illegal detention. Therefore, the focus of our analysis is on the nature of and circumstances surrounding Officer Hammer's interaction with Appellant.

In Pennsylvania it is well established that there are three levels of interaction between police and individuals which require differing levels of suspicion in order for the interaction to be lawful:

> The first is a mere encounter, which need not be supported by any level of suspicion. The second is an investigative detention, which must be supported by reasonable suspicion. This interaction subjects a suspect to

6

a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. The third category, a custodial detention, must be supported by probable cause. The police have probable cause where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed. Commonwealth v. Caban, 60 A.3d 120, 127 (2012) (internal citations and quotation marks omitted).

Application of the constitutional precepts controlling a consensual search following a traffic stop is somewhat complicated in this matter as Appellant was not the driver of the vehicle that was stopped. However, as he was subject to a lawful detention prior to the disputed consensual search that uncovered two illegal pills, the interaction at issue is a "post-detention interaction." The issue presented to this Court is very similar to the scenario discussed in Commonwealth v. Strickler,[7] a case cited by both parties as guidance for the Court's analysis in this matter.

When applying the principles espoused in Strickler, the Superior Court succinctly explains the necessary inquiry which governs the resolution of the issue presented by Appellant:

> The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures, thereby ensuring the "right of each individual to be let alone." *Schneckloth v. Bustamonte,* 412 U.S. 218, 236, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Commonwealth v. Blair,* 394 Pa.Super. 207, 575 A.2d 593, 596 (1990). Specifically, police officers may not conduct a warrantless search or seizure unless one of several recognized exceptions applies. *See Schneckloth,* 412 U.S. at 219, 93 S.Ct. 2041; *Blair,* 575 A.2d at 596–97. One such exception is a search conducted pursuant to consent voluntarily given. *See Blair,* 575 A.2d at 597 (citation omitted). The Fourth Amendment inquiries in consent cases entail a two-prong assessment: first, the constitutional validity of the citizen/police encounter giving rise to the consent and, second, the voluntariness of said consent. *See Commonwealth v. Strickler,* 563 Pa.

---

[7] Commonwealth v. Strickler, 563 Pa. 47, 757 A.2d 884 (2000).

7

47, 757 A.2d 884, 888 (2000) (citation omitted). Where the underlying encounter is found to be lawful, voluntariness becomes the exclusive focus. *See id.,* 757 A.2d at 889 (citation omitted). If a defendant's initial detention violates the Fourth Amendment, then any evidence seized during that stop must be excluded as fruit of an unlawful detention absent a demonstration by the government both of a sufficient break in the causal chain between the illegal detention and the seizure of evidence, thus assuring that the search is not an exploitation of the prior illegality, and of voluntariness. *See id.,* 757 A.2d at 889 (citation omitted).

Commonwealth v. By, 812 A.2d at 1254-55 (2002).

Based upon the credible testimony presented by the Commonwealth at the suppression hearing, this Court finds that the police encounter with Appellant took place as follows: Officers Henry and Hammer responded to the scene of the incident based upon Cpl. Meik's radio call requesting assistance in the apprehension of a wanted fugitive, Mr. King. Cpl. Meik had identified Mr. King as the driver of the vehicle he was following, which vehicle also housed a passenger. Once the vehicle was stopped, Cpl. Meik saw Appellant immediately exit as he was approaching the driver's side. Cpl. Meik knew Appellant well due to multiple previous police encounters and also knew that he was on state parole.

When Cpl. Meik radioed for assistance he did not specify which individual was wanted by police, for what offense the person was wanted, or where the individual was sitting in the car. Therefore, when Officer Henry and, subsequently, Officer Hammer arrived, neither knew who was the fugitive or what level of danger they were facing. The events were unfolding quickly because Appellant immediately exited the vehicle. Although Officer Henry's encounter began with his gun drawn, once he determined that Appellant was unarmed, he immediately holstered his weapon and completed the pat-down. The two men stepped behind the vehicle Mr. King had been driving and

8

casually leaned on the police cruiser while Appellant asked questions about what was happening to King. Based on well-established legal principles and the circumstances to that point, it is clear that Officer Henry possessed a reasonable and articulable suspicion that Appellant was engaged in criminal activity and, thus properly conducted a "*Terry frisk*" to assure officer safety and dispel any suspicions. *(See* Caban, *supra.)*

Around the same time, Officer Hammer arrived on scene and observed Officer Henry speaking with Appellant, so he checked with Cpl. Meik for his instructions. Because Cpl. Meik knew Appellant was on parole, he directed Officer Hammer to determine if there were any outstanding warrants for his arrest. Officer Hammer requested Appellant's identification cards, which he willingly provided.

Based on Strickler and By referenced above, we must first examine the circumstances surrounding Officer Hammer's interaction with Appellant when he checked for warrants, to determine whether the consent provided later was valid. It is notable that, while acknowledging that the forcible stop of an automobile implicates the protections of the Fourth Amendment, the Superior Court has found that during a routine traffic stop, it is not a violation of an individual's right to privacy when an officer requires that the passengers exit a vehicle as well as the driver. Commonwealth v. Campbell, 862 A.2d 659, 663 (Pa. Super. 2004). The Superior Court has stated:

> In addition to the documentation that the police are permitted to obtain from the driver, during a routine traffic stop, a police officer may request a driver to step out of the vehicle as a matter of course. *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *Commonwealth v. Lopez,* 415 Pa.Super. 252, 609 A.2d 177 (1992). In *Maryland v. Wilson,* 519 U.S. 408, 414, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), the Court extended this rule to passengers in a stopped vehicle. The Supreme Court found that the interest in officer safety outweighs the

9

minor intrusion on passengers who are "already stopped by virtue of the stop of the vehicle." *Id.; see also Commonwealth v. Brown,* 439 Pa.Super. 516, 654 A.2d 1096, 1102 (1995), *appeal denied,* 544 Pa. 642, 664 A.2d 972 (1995) (police officer may request both drivers and their passengers to alight from lawfully stopped vehicles regardless of whether the police officer has a reasonable suspicion that criminal activity is afoot). <u>Campbell</u>, 862 A.2d at 663-64 (Footnote omitted).

Further, the Court in <u>Campbell</u> went on to also find that a Fourth Amendment constitutional violation was not committed when a second officer requested that the passengers identify themselves while the officer who initiated the stop continued his interaction with the driver. <u>Id</u>. at 665. Applying <u>Campbell</u>, the Superior Court later determined that when such a valid request is made by an officer in the context of a mere encounter, a person may rightfully refuse identification. <u>Commonwealth v. Durr</u>, 32 A.3d 781, 786. However, if that person complies with the officer's request during a mere encounter and is subsequently arrested because the officer determines that an active arrest warrant is outstanding, no Fifth Amendment rights are implicated because, once again, no compulsion is present during the interaction. <u>Durr</u>, 32 A.3d at 786.

Although the instant case is not factually identical to <u>Campbell</u> and <u>Durr</u>, the principles espoused validate Cpl. Meik's request that Officer Hammer obtain Appellant's identification and determine if he is wanted based upon a violation of his parole. According to the <u>Campbell</u> and <u>Durr</u>, if Appellant had remained in the vehicle when it was stopped, the officer could have lawfully requested him to exit the vehicle and asked for identification. Of great import though, is that the circumstances which the officers encountered in this case, as compared to <u>Campbell</u> and <u>Durr</u>, were much more precarious as they were pursuing a wanted fugitive, not conducting a routine traffic stop. As the courts have deemed it permissible for police to require passengers to exit a car and to request identification in much less serious circumstances, this Court finds that

10

the actions taken by Officer Hammer in requesting identification to check for warrants under uncertain and potentially dangerous circumstances were certainly constitutional and did not rise to an unlawful or coercive detention.

Officer Hammer's search took only a few minutes, at which time he returned the identification to Appellant and informed him that no outstanding warrants were found and that he should inform his parole officer about his police contact. Officer Hammer told Appellant he was "good to go." However, Appellant did not leave; instead he remained and continued to ask questions and express concern about his friend's circumstances.

Officer Hammer then asked Appellant if he had anything on him, meaning contraband or weapons. Appellant said no, and Officer Hammer followed up by asking permission to search him. Appellant responded by nodding his head, facing his body to the officer and putting his hands in the air. The search uncovered two pills in a front pants pocket, which Appellant later admitted were Ecstasy, an illegal controlled substance.

The timeframe critical to the analysis of the issue presented by Appellant is from the beginning of Officer Hammer's interaction with him up to the search of his person. We have already determined that Officer Henry's detention for a pat-down was lawful and Officer Hammer's ID check was lawful. Therefore, the remaining issue is whether Officer Hammer's subsequent request to search was a constitutionally sound encounter and thus, lawful consent was given. Appellant argues that it was not consensual and the Commonwealth argues that it was. Review of caselaw instructs

11

this Court that the resolution of this issue requires a multi-part analysis of the totality of the circumstances. *See* Strickler; By; *supra.*

The court in Strickler conducted a detailed analysis of "the possibility of a mere encounter following a traffic stop or similar detention" and whether an individual upon an assessment of the totality of the circumstances could give consent to a subsequent search when requested by police. To analyze the issue, the court noted that:

> Various courts and commentators have frequently set forth non-exclusive lists of factors deemed relevant to the determination of whether a seizure has been effected. For example, the presence or absence of police excesses has played a particularly significant role in United States Supreme Court jurisprudence. Physical contact or police direction of a citizen-subject's movements has also been regarded as a central consideration. This Court has also stressed more subtle factors, for example, the demeanor of the police officer, the location of the confrontation, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements.

Strickler, 563 Pa. 47, 72-73, 757 A.2d 884, 897-98 (2000)(internal citations and footnotes omitted).

Turning to the factual scenario presented by this case, this court finds that, upon review of the totality of the circumstances, appellant was not unlawfully seized by Officer Hammer, and he provided valid consent to search his person which ultimately led to the discovery of illegal drugs.

We've already found that Ofc. Hammer's encounter with appellant during which he requested identification to check for outstanding warrants, was lawful. Officer Hammer then returned appellant's identification and specifically told him that he was "good to go". At this point in time there was a clear break in the interaction between Officer Hammer and appellant; however, appellant did not leave. Therefore the focus of

12

the analysis becomes the remaining interaction between Officer Hammer and appellant leading up to the request for consent to search.

The testimony presented at the suppression hearing establish that Ofc. Hammer clearly told appellant that he was "good to go." Appellant initially exited the stopped vehicle on his own, and once Officer Henry conducted the "*Terry frisk*," Appellant's focus was obtaining information to allay his concern for Mr. King. The casual nature of the interaction between appellant and Officer Henry, as well as the interaction between appellant and Officer Hammer after his identification was returned, clearly indicates there was no excessive imposition of authority by police.

Other weighty factors indicating appellant's voluntary, unequivocal consent include: Appellant was not handcuffed, the parties were located on a public street, the casual nature of the conversation between appellant and the officers, the numerous previous encounters with police that provided Appellant with the knowledge that he was free to refuse consent and an awareness of his constitutional rights. An even more persuasive fact considered by this court is appellant's actions when asked by Ofc. Hammer if he could search appellant's person. Appellant calmly responded by nodding his head "yes", putting his hands in the air. This factor, coupled with the others discussed above, clearly support this court's finding that appellant voluntarily consented to the search by Ofc. Hammer and, therefore, the search which uncovered the illegal drugs was lawfully conducted.

Therefore, in conclusion, this Court finds that Appellant's claim is without merit as he provided Officer Hammer valid consent to search his person.

13

BY THE COURT

_____

RICHARD A. LEWIS, PRESIDENT JUDGE

Memorandum date:

February _____17_____, 2015

DISTRIBUTION: 2-18-15 @ 10:30AM
Kristie Falbo, Esq., Deputy District Attorney  i|o
Paul W. Muller, Esq., Chief Deputy Public Defender  i|o
Clerk of Courts  KC
X Superior Court Prothonotary  mai|
Court Admin. – Criminal  i|o
FILE – Judge Lewis  i|o

2015 FEB 18 AM 10: 12
DAUPHIN COUNTY PENNA
OFFICE OF CLERK OF COURT

14