[Cite as *State v. Orosz*, 2017-Ohio-707.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2016-L-057** |
| JOSHUA OROSZ, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2015 CR 000643.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, *Teri R. Daniel,* Assistant Prosecutor, and *Jacqueline M. O'Donnell,* Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Charles R. Grieshammer,* Lake County Public Defender, and *Vanessa R. Clapp,* Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

DIANE V. GRENDELL, J.

{¶1} Defendant-appellant, Joshua Orosz, appeals the denial of his Motion to Suppress in the Lake County Court of Common Pleas. The issue before this court is whether a police officer has probable cause and/or reasonable suspicion to remove and search a passenger in a vehicle driven by a known drug dealer after observing the passenger hiding something in his pants. For the following reasons, we affirm the decision of the court below.

{¶2} On November 25, 2015, the Lake County Grand Jury returned an Indictment against Orosz, charging him with Possession of Heroin (Count 1), a felony of the fifth degree in violation of R.C. 2925.11, and Possession of Cocaine (Count 2), a felony of the fifth degree in violation of R.C. 2925.11. Both Counts contained Forfeiture Specifications (Contraband) as provided for in R.C. 2941.1417 and R.C. 2981.04.

{¶3} On December 18, 2015, Orosz waived the right to be present at arraignment and entered a plea of "Not Guilty" to all charges.

{¶4} On January 22, 2016, Orosz filed a Motion to Suppress.

{¶5} On February 12, 2016, the State filed its Response to Defendant's Motion to Suppress.

{¶6} On February 18, 2016, a suppression hearing was held. The State presented the testimony of the following witnesses:

{¶7} Officer Ryan Butler of the Mentor Police Department testified that, on the evening of August 2, 2015, he observed a southbound vehicle on State Route 306 operated by Carlos Pino, "known by [the] department for dealing drugs" and "arrested quite a few times by [the Mentor police] in the past." Within the preceding week, the department received "information from one of our narcotics detectives that Carlos was recently released from prison and they had reason to believe that he was again dealing heroin within the area."

{¶8} At about 10:04 p.m., Officer Butler stopped Pino's vehicle at a Shell gas station at the corner of Mentor Avenue for "fail[ing] to signal at least one hundred feet prior to making a turn into the gas station." Before Officer Butler could approach the

2

vehicle, Orosz emerged from the passenger's side. Officer Butler ordered Orosz back in the vehicle.

{¶9} Officer Butler approached the vehicle from the passenger's side[1] and advised Pino of the reason for the stop. He described his interaction with Orosz thus: "He spoke to me a little bit about where they were coming from, but I could tell he was breathing really heavily from his chest, you know, rapidly rising and lowering. I can tell he was avoiding eye contact with me. He wasn't very comfortable with me being there, with being stopped."

{¶10} Officer Butler determined to issue Pino a warning for the turn signal violation and to request a K-9 unit. During this time, other police officers arrived on the scene.

{¶11} Officer Richard Smith of the Mentor Police Department testified that during his three-and-a-half years with the police department he had engaged in "several hundred" drug-related arrests. On August 2, 2015, he responded to the Shell station where Officer Butler has stopped Pino's vehicle.

{¶12} Upon arriving, Officer Smith observed an Officer Wayne speaking with the occupants of the vehicle from the driver's side. Officer Smith took a stand about ten feet from "the right rear quarter panel of the vehicle" where he "had a good view of both occupants inside the vehicle." Officer Smith overheard Orosz ask Officer Wayne several times if he could leave the scene. Officer Smith noted that Orosz' "entire body was shaking" and, based on his "motions inside the vehicle" and "wanting to get out of the vehicle," that "he was nervous to be around police officers."

---

1. Officer Butler testified: "[Approaching from the passenger's side] is just something that I normally do with any traffic stop, but especially since [Orosz] was trying to get out of the vehicle. Obviously he turned his head to look at me. He knew I was behind him. So I don't know why he was trying to get out."

{¶13} Officer Smith noted that both Pino and Orosz watched Officer Wayne as he turned and walked away from their vehicle. They were unaware of his presence. As soon as Officer Wayne reached Officer Butler's patrol car, Orosz began moving around, making "heavy left to right movements * * * indicating that he was obviously at that point manipulating something." Officer Smith moved closer to the vehicle and positioned himself "at the B-pillar of the vehicle," i.e., "between the passenger side door and the passenger side rear door." In addition to noting "the movements big time from left to right," Officer Smith observed Orosz "moving * * * his waist up and down in the seats; in almost like a thrusting motion * * * lifting his butt off the ground [seat]." Orosz was wearing athletic shorts and had his right hand inside his shorts up to the mid-forearm. Officer Smith had no doubt that Orosz "was hiding some sort of contraband * * * either weapons or drugs."

{¶14} Officer Smith ordered Orosz out of the vehicle. He placed Orosz in handcuffs, removed him a few feet from the vehicle, and had him spread his legs at which point a bindle of heroin fell out of the right pants leg. Officer Smith testified: "I want to make sure that there's no weapons, immediate weapons. And then most of the time what we'll do is we'll just kind of shake their shorts out which will hopefully knock loose * * * whatever's in there and that's what happened in this case."

{¶15} Officer Smith placed Orosz under arrest and a bindle of cocaine was found in his sock.

{¶16} At the conclusion of the hearing, the trial court denied the Motion to Suppress. In concluding that there was probable cause to remove Orosz from the vehicle and search him, the court remarked on his several attempts to leave the scene

4

and nervousness. The court observed that Orosz' nervousness was not the typical nervousness "that perhaps the driver would display for getting pulled over." "Most important" was Orosz's conduct when he believed that he was not being watched. The court stated that it "went beyond furtive gestures when you see the Defendant with his hand actually down his pants, deep down his pants, attempting to manipulate, conceal or retrieve something."

{¶17} On February 19, 2016, the trial court issued a Judgment Entry memorializing the denial of Orosz' Motion to Suppress.

{¶18} On May 2, 2016, Orosz entered a plea of "no contest" to both Counts of the Indictment.

{¶19} On May 6, 2016, the trial court issued a Judgment Entry of Sentence, sentencing him to two years of community control.

{¶20} On June 3, 2016, Orosz filed a Notice of Appeal. On appeal, Orosz raises the following assignment of error:

{¶21} "[1.] The trial court erred when it denied the defendant-appellant's motion to suppress in violation of his due process rights and rights against unreasonable search and seizure as guaranteed by Sections 10 and 14, Article I of the Ohio Constitution and the Fourth and Fourteenth Amendments to the United States Constitution."

{¶22} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. At a suppression hearing, "the trial court is best able to decide facts and evaluate the credibility of witnesses." *State v. Mayl*, 106 Ohio St.3d 207, 2005-Ohio-4629, 833

N.E.2d 1216, ¶ 41. "Its findings of fact are to be accepted if they are supported by competent, credible evidence, and we are to independently determine whether they satisfy the applicable legal standard." *Id.* The reviewing court must then "independently determine as a matter of law, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citation omitted.) *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 12; *Kirtland Hills v. Jenisek*, 11th Dist. Lake No. 2015-L-1117, 2016-Ohio-3401, ¶ 11 ("[o]nce the appellate court accepts the trial court's factual determinations, the appellate court conducts a de novo review of the trial court's application of the law to these facts") (citation omitted).

{¶23} The Fourth Amendment to the United States Constitution provides for "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[2]

{¶24} "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108-109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), quoting *Terry v. Ohio*, 391 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) ("[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."). "[T]he reasonableness of such seizures depends on a balance between the public interest and the individual's

---

2. Article I, Section 14 of the Ohio Constitution provides as follows: "The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized." Except in certain circumstances not relevant here, the Ohio Supreme Court "has interpreted Section 14, Article I of the Ohio Constitution as affording the same protection as the Fourth Amendment." *State v. Robinette*, 80 Ohio St.3d 234, 238, 685 N.E.2d 762 (1997).

6

right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Price*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.E.2d 607 (1975).

**{¶25}** It is well-established that warrantless searches, i.e., "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." (Footnote omitted.) *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 N.E.2d 576 (1967).

**{¶26}** One such exception is known variously as a protective search or "patdown" or "stop and frisk": "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry* at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* "And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.*

**{¶27}** In considering the reasonableness of protective searches in the context of automobile stops, the United States Supreme Court has "recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile." *Mimms*, 434 U.S. at 110, 98 S.Ct. 330, 54 L.Ed.2d 331. Further recognizing that the "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition

to the driver in the stopped car," the Supreme Court has held "that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 414-415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).

**{¶28}** "To justify a patdown of the driver or a passenger during a traffic stop * * *, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009); *State v. Bobo*, 37 Ohio St.3d 177, 524 N.E.2d 489 (1988), paragraph two of the syllabus ("[w]here a police officer, during an investigative stop, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others").

**{¶29}** In the present case, Orosz "does not challenge the stop of the car in which he was a passenger," but "he [does] challenge the officer's search of his person, asserting that the officers possessed neither reasonable suspicion or specific and articulable facts upon which to base the warrantless search." Appellant's brief at 4-5. Orosz emphasizes that association with a suspected drug dealer, nervous behavior, and furtive movements do not necessarily support a reasonable suspicion sufficient to justify the warrantless search. We disagree. Considering the totality of the circumstances, Officer Smith reasonably suspected Orosz of being armed and properly conducted a protective search for weapons.

**{¶30}** The fact that Orosz was in a vehicle being driven by a known and/or suspected drug dealer is significant. As the United States Supreme Court has recognized the enhanced risks encountered by police officers during automobile stops,

8

the Ohio Supreme Court has recognized the enhanced risk of persons engaged in narcotics trafficking being armed. "The right to frisk is virtually automatic when individuals are suspected of committing a crime, like drug trafficking, for which they are likely to be armed." *State v. Evans*, 67 Ohio St.3d 405, 413, 618 N.E.2d 162 (1993).[3]

{¶31} Orosz' association with Pino was not the only circumstance justifying the search.

{¶32} The trial court was careful to note that Orosz' nervousness was extreme ("breathing really heavily"; "avoiding eye contact"; "entire body was shaking"; and "wanting to get out of the vehicle"). Although it is recognized that any encounter with law enforcement may cause a person to become nervous, Orosz' level of distraction was atypical. It was Pino who was the focus of the traffic stop. As Orosz was only a passenger in the vehicle, his discomfort was not normal given the circumstances and reasonably contributed to the officers' suspicions.

{¶33} Finally, Orosz was observed in the act of deliberately concealing, or possibly retrieving, something Officer Smith justifiably under the circumstances believed to be contraband or a weapon. We emphasize that Orosz' actions were not equivocal furtive gestures, but a recognizable attempt to conceal something.

{¶34} Considering the totality of the circumstances, Officer Smith reasonably suspected that Orosz might have been armed and dangerous. This conclusion is readily confirmed by a consideration of the circumstances in which other courts have upheld the constitutionality of protective searches.

---

3. In *Evans*, the Ohio Supreme Court upheld a protective search based on a radio report that a person matching the defendant's description had participated in a drug transaction. *Id.* at 412.

9

{¶35} In *Arizona v. Johnson*, 555 U.S. 323, 327, 129 S.Ct. 781, 172 L.Ed.2d 694, a passenger in a vehicle stopped for having its registration suspended was properly patted down for officer safety, despite the fact that "the officers had no reason to suspect anyone in the vehicle of criminal activity," where: "as the police approached, Johnson looked back and kept his eyes on the officers"; "Johnson was wearing clothing, including a blue bandana, that [the officer] considered consistent with Crips membership"; Johnson had a scanner in his jacket pocket which "'struck [the officer] as highly unusual and cause [for] concern,' because 'most people' would not carry around a scanner that way 'unless they're going to be involved in some kind of criminal activity or [are] going to try to evade the police by listening to the scanner'"; and Johnson "volunteered that he was from Eloy, Arizona, a place [the officer] knew was home to a Crips gang" and "that he had served time in prison for burglary and had been out for about a year." *Id.* at 327-328.

{¶36} In *State v. Hall*, 8th Dist. Cuyahoga No. 97722, 2012-Ohio-4155, a passenger in a vehicle stopped for driving at night without headlights was properly patted down where: "during his initial approach of the vehicle, [the officer] observed Hall shove an unidentified object into his right boot" and "testified that he has, in previous instances, recovered small guns that were concealed in the type and style of boot that Hall was wearing." *Id.* at ¶ 10.

{¶37} In *State v. Covert*, 3d Dist. Seneca Nos. 13-11-02 and 13-11-03, 2011-Ohio-4713, a passenger in a vehicle stopped for driving without headlights at night was properly patted down, "[a]lthough [the officer] did not have an individualized suspicion that Covert or any of the other backseat passengers were armed and dangerous,"

because "the situation, in and of itself, called for precaution": "Officer Aller was preparing to search a motor vehicle occupied by a number of people with only one other officer for back-up"; "the driver had previously been involved with drugs, having albeit claimed that he no longer lived that kind of life"; a "female passenger had a misdemeanor warrant for her arrest on an unknown charge"; "and the other three occupants of the vehicles were males who were each approximately 5' 8" tall and weighed between 160–180 pounds." *Id.* at ¶ 17.

**{¶38}** In *State v. Sears*, 2d Montgomery No. 20849, 2005-Ohio-3880, a passenger in a vehicle stopped because it was registered to a person with a suspended license was properly patted down where: the "[d]efendant reached down toward the floor of the vehicle while Officer Neubauer was preoccupied with the driver, examining his license"; "Officer Neubauer could not see what was in Defendant's hand, and when Officer Neubauer ordered Defendant to show his hands Defendant did not immediately comply but rather had to be told repeated times to show his hands." *Id.* at ¶ 28.

**{¶39}** In *State v. Smith*, 11th Dist. Portage No. 2013-P-0054, 2015-Ohio-1204, this court affirmed a protective search during a consensual encounter where: "Smith became loud and wanted to leave the scene, variously explaining that he needed to catch a bus to go to Ravenna and/or the Akron Children's Hospital"; "Smith was also 'moving around and waving his arms around,' behavior that Officer Poe described as not 'normal'"; "Smith was wearing 'baggy' clothes and had several bulges in the pockets of his pants"; and "Officer Poe had to order Smith to keep his hands out of his pockets." *Id.* at ¶ 19.

**{¶40}** The sole assignment of error is without merit.

11

{¶41} For the foregoing reasons, the denial of Orosz' Motion to Suppress by the Lake County Court of Common Pleas is affirmed. Costs to be taxed against appellant.


CYNTHIA WESTCOTT RICE, P.J.,

TIMOTHY P. CANNON, J.,

concur.