FILED

01/24/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

June 5, 2019 Session

**STATE OF TENNESSEE v. JERRY LEE JOYNER**

**Appeal from the Circuit Court for Dyer County**
**No. 17-CR-284     R. Lee Moore, Jr., Judge**

_____

**No. W2019-00106-CCA-R3-CD**

_____

Defendant, Jerry Joyner, was indicted by the Dyer County Grand Jury on the following counts: (1) possession with intent to sell or deliver a controlled substance, schedule II, to wit, methamphetamine, in an amount in excess of 0.5 grams; (2) possession with intent to sell or deliver a controlled substance, schedule II, to wit, cocaine, in an amount in excess of 0.5 grams; (3) possession with intent to sell or deliver a controlled substance, schedule II, to wit, morphine; (4) possession with intent to sell or deliver a controlled substance, schedule II, to wit, hydrocodone; and (5) possession with intent to sell or deliver a controlled substance, schedule IV, to wit, alprazolam. Following an evidentiary hearing on Defendant's motion to suppress the evidence retrieved from a search of his person, the trial court granted his motion and dismissed, in separate judgments, all five counts of the indictment against Defendant. The State appeals the granting of Defendant's motion to suppress on grounds that the search at issue was constitutional. After review, we reverse the judgments of the trial court, reinstate the charges in the indictment, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Circuit Court Reversed and Remanded**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; C. Phillip Bivens, District Attorney General; and Lance Webb, Assistant District Attorney General, for the appellant, State of Tennessee.

Charles S. Kelly, Sr., Dyersburg, Tennessee, for the appellee, Jerry Lee Joyner.

# OPINION

## Motion to Suppress Hearing

This case arises from the search of Defendant's person during a traffic stop on February 20, 2017. Defendant filed a pretrial motion to suppress the seized evidence, alleging that the search of his person was unconstitutional. The hearing on the motion to suppress presented the following evidence.

Officer Kevan Ward with the Dyersburg Police Department testified that on February 20, 2017, he responded to a complaint from the manager of the apartment complex where Defendant lived, regarding two vehicles in the parking lot. The apartment manager told law enforcement that she was having a problem with drugs on the premises and wanted the vehicles to leave the parking lot. After arriving at the apartment complex, Officer Ward observed that one vehicle had left the premises, but the other, a white Ford F250 truck, was still present. Officer Ward stated that he knew that Defendant lived at the complex prior to the complaint from the manager because he had investigated a previous complaint regarding Defendant "selling pills[.]"

Officer Ward testified that he approached the white Ford F250 in the parking lot and asked the driver of the vehicle, Mr. Michael Hale, why he was at the apartment complex. Mr. Hale told Officer Ward that he had speakers in the back of his truck and that he and Defendant were going to "go riding or something." Officer Ward stated that he then asked Mr. Hale to leave the parking lot and that Mr. Hale agreed to do so. After Officer Ward left the premises, he noticed Mr. Hale's vehicle heading back in the direction of the apartment complex. Officer Ward turned his vehicle around and proceeded back toward the apartment complex as well. He testified that he parked across the street and observed Mr. Hale exit his truck and walk into Defendant's apartment. Officer Ward stated that Mr. Hale was inside Defendant's apartment for approximately five minutes before returning to his vehicle. Office Ward did not notice anyone else with Mr. Hale at that time.

Officer Ward testified that he followed behind Mr. Hale's vehicle once Mr. Hale had left the parking lot again and noticed that Mr. Hale's vehicle tags were expired. Officer Ward "went to make a traffic stop" and turned on his blue lights. Mr. Hale drove through a red light before pulling over for the stop. At the time of the initial stop, Officer Ward was the only officer present. He testified that he approached the driver's side of Mr. Hale's vehicle and noticed that Defendant was sitting in the passenger seat. Officer Ward testified that he asked Mr. Hale to exit the vehicle and "come to the back" to talk. Defendant remained in the vehicle at this time. In about five minutes, Officer Mason Hammond arrived at the scene. Officer Ward stated that a canine officer was also in

route to the scene and that he saw Officer Hammond remove Defendant from the vehicle. Officer Ward stated that he was close enough to hear the conversation between Officer Hammond and Defendant. Officer Ward heard Officer Hammond ask Defendant if he could search his person. Officer Ward heard Defendant say "yes, sir" in response to Officer Hammond's question.

Additionally, Officer Ward testified that he asked Mr. Hale if he could search his person and that Mr. Hale also agreed. Officer Ward stated that he was searching Mr. Hale at the same time that Officer Hammond was searching Defendant. Officer Ward stated that he did not find any contraband on Mr. Hale's person. He further testified that he did not see the search of Defendant's person and could only "see the top of their heads" because of his location at the back of the truck. He stated that at some point, Officer Hammond indicated to him that he had found something "in the way of contraband" during the search of Defendant. Officer Ward testified that Defendant was subsequently handcuffed. Additionally, Officer Ward testified that the canine officer arrived at the scene and conducted a search of Mr. Hale's truck. The canine "indicated" on the truck, and a subsequent search of the vehicle followed. Officer Ward testified that two handguns were found in the glove compartment; however, Defendant was not implicated in any charges related to the handguns.

On cross-examination, Officer Ward explained that he asked Mr. Hale to leave the apartment complex initially "to keep conflict down between [Mr. Hale] and [the apartment complex manager]." He stated that he did not call to check on Mr. Hale's license tag when he saw the white Ford F250 sitting in the parking lot of the apartment complex because he does not generally look at a vehicle's license tag when the individuals are sitting in the car. Officer Ward explained he would have checked Mr. Hale's tag if he was not sitting in the vehicle and if he was trying to identify the owner of the vehicle. Regarding Mr. Hale's return to the parking lot of the apartment complex, Officer Ward explained that he "thought it was weird that [Mr. Hale] would tell [him] he would stay away, but that [Mr. Hale] would go right back." Officer Ward then reaffirmed that he did not know Defendant was in the vehicle until he had stopped Mr. Hale.

Officer Ward testified that the sticker on Mr. Hale's vehicle was an expired 2016 tag. After stopping the vehicle, Officer Ward stated that he called dispatch to verify the owner. He testified that he did not know that Mr. Hale had purchased an updated tag nor did Mr. Hale show him the 2017 sticker. Further, Officer Ward stated that he did not give Mr. Hale a ticket but instead issued him a warning. Officer Ward did not believe Mr. Hale was traveling at an excessive speed during the time of the traffic offense and restated that Mr. Hale ran through a red light before pulling over. When asked why he wanted Mr. Hale to exit the vehicle immediately after stopping, Officer Ward explained

that he had noticed Defendant in the passenger seat of the vehicle and wanted to talk to Mr. Hale privately. When questioning Mr. Hale at the scene, Officer Ward wanted to know why Defendant was in the vehicle when Mr. Hale had reported to him previously in the parking lot that Defendant was not home at his apartment. Officer Ward testified that he was interested as to why Mr. Hale was at Defendant's apartment because Officer Ward had previously heard about Defendant selling drugs. Further, he testified that he asked Mr. Hale to step out of the vehicle because individuals should be separated when questioned because "you don't ask them in front of each other."

Officer Ward admitted he did not have anything but a cite and release violation. Officer Ward stated that he did not talk to Officer Hammond prior to the stop. He explained that he called dispatch once he stopped Mr. Hale and that he had only spoken to the canine officer. Officer Ward was unsure how Officer Hammond knew about the situation, but he stated that Officer Hammond knew the canine officer was coming to the scene. He testified that "any time we run a canine[,] you pull everyone out of the vehicle." Officer Ward reaffirmed that Mr. Hale consented to a search of his person and that Defendant had been searched by Officer Hammond. He testified that a pipe was found on Defendant's person and that he believed more contraband was retrieved following the initial recovery. Officer Ward restated that he knew of Defendant before the encounter on February 20, 2017. Furthermore, Officer Ward stated that he heard Defendant consent to a search by Officer Hammond and he explained that Officer Hammond conducted a *Terry* patdown search. *See Terry v. Ohio*, 392 U.S. 1 (1968). Officer Ward stated that this search did not turn up any weapons on Defendant's person but that after Officer Hammond "pulled out the needle" and "the baggies," Defendant mentioned a bigger bag located inside of his pants. Officer Ward testified that Officer Hammond asked Defendant if he could "search" him but did not indicate specifically if it was an interior search or a patdown search.

Regarding his search of Mr. Hale, Officer Ward explained that he conducted a *Terry* search first because even if consent is given, he is unaware of what is in an individual's pockets. He stated that he does not "want to stick [his] hand in and grab a needle or anything." Officer Ward confirmed that he searched inside Mr. Hale's pockets after the patdown search but denied finding anything in his pockets. Further, Officer Ward explained that the canine unit was on standby until he and Officer Hammond were finished searching both Mr. Hale and Defendant's persons. Officer Ward also testified that the canine did not find any more drugs within the vehicle. On redirect examination, Officer Ward confirmed that he stopped Mr. Hale both for the expired tag and because he ran through a red traffic light.

Officer Hammond of the Dyersburg Police Department testified that he had worked for the police department for approximately two and half years prior to the

incident with Defendant and that he had previously worked as a jailor with the Dyer County Sherriff's Office. Officer Hammond confirmed that he responded to the scene of a traffic stop on February 20, 2017, between four and five minutes after the stop. He saw Officer Ward talking to the driver, and Officer Hammond made contact with the passenger in the vehicle. Officer Hammond testified that he asked Defendant to step out of the vehicle because the canine unit was in route to do a free air sniff. He testified that it is policy for everyone to step out of the vehicle for both the dog's safety and the handler's safety. Officer Hammond stated that he asked Defendant if he could search him and that Defendant consented to the search by verbally saying "yes." Officer Hammond explained that before he does an in depth search, he likes "to pat down for weapons to make sure they are not armed." He stated that there are concerns with putting his hands in an individual's pockets because "you could run your hand into a knife or a needle."

Officer Hammond explained that he conducted a patdown search of Defendant and felt what he believed to be a glass pipe used to smoke crack cocaine. Officer Hammond asked Defendant what the object was, and Defendant said it was a glass "crack pipe." Officer Hammond handcuffed Defendant and retrieved the pipe from Defendant's pocket. Defendant was under arrest at this point. Following the arrest, Officer Hammond then conducted a more thorough search of Defendant's person. Officer Hammond found a large gallon baggie full of smaller bags and pill containers located inside the front of Defendant's pants. Officer Hammond testified that there were at least three different pill containers, a bag of marijuana, a bag of what he believed to be methamphetamine, a bag of what he believed to be crack rock, and a bag of powder cocaine. He stated that the methamphetamine and cocaine were field tested and both tested positive as methamphetamine and cocaine respectively. Additionally, he found two more pipes and a syringe in the gallon bag. No other contraband was found on Defendant's person other than a small bag of rock cocaine which fell out of Defendant's pocket when the pipe was retrieved. Officer Hammond confirmed that a handgun was retrieved from the vehicle, but he did not believe Defendant was charged with anything related to the handgun.

On cross-examination, Officer Hammond testified that he did not know why Officer Ward had initially pulled over Mr. Hale's vehicle prior to arriving on the scene. He stated that he did not speak to Officer Ward when he got to the scene because Officer Ward was talking to Mr. Hale. He explained that he heard on "radio traffic" that Officer Ward had called for a canine, and Officer Hammond knew to pull the passenger out of the other side of the vehicle. He stated that he went straight to the passenger side of the vehicle and asked Defendant to step out. He testified that he asked Defendant if he could search his person and by "search" he meant the interior of Defendant's pockets and Defendant's person. Officer Hammond testified that because Defendant had consented to the search, he could search the interior of Defendant's pockets.

Officer Hammond denied having any knowledge of Defendant prior to the events on February 20, 2017. He testified that he had not heard of Defendant dealing drugs nor had he heard that Defendant's brother was a detective at the police department. He stated that he did not believe Defendant was high "or screwed up in any manner" at the time of his arrest. Officer Hammond was unsure why Defendant would give him consent knowing he had contraband in his pockets. He further stated that he arrived at the traffic stop on his own free will, but he acknowledged that Officer Ward had called for the canine unit.

Officer Ward was recalled to the stand to testify to the time it took for Officer Hammond to arrive on the scene. He stated that no more than five minutes had passed from the time he stopped Mr. Hale until the time Officer Hammond arrived. Additionally, Officer Ward estimated that he was on the scene for approximately fifteen to twenty minutes for the entire encounter.

Defendant testified that he was fifty-nine years old, and he confirmed that he lived at the apartment complex where Officer Ward first had contact with Mr. Hale. He stated that the parking lot was for both visitors and residents of the complex. He testified that there were no signs in the parking lot that restricted drifters. Defendant stated that on February 20, 2017, Mr. Hale was a visitor at his apartment complex. He confirmed that Mr. Hale drove a Ford F250 truck. He stated that he left the premises with Mr. Hale in the vehicle and "during [his] short trip[,]" he saw the reflection of blue lights. He stated that Mr. Hale pulled the vehicle over and that Officer Ward approached the driver's side. He recalled that Officer Ward asked Mr. Hale to exit the vehicle and that the two of them approached the back of the truck. Defendant stated that he was inside the vehicle for about five to seven minutes before Officer Hammond approached him. He testified that Officer Hammond asked him to get out of the vehicle. He stated that Officer Hammond did not ask whether or not he could search his person but "immediately grabbed hold of [him]" and "turned [him] around this way and started patting [him] down." Defendant stated that Officer Hammond found something in his pocket and pulled out the glass pipe. He explained that nothing was in the glass pipe nor had anything ever been in the pipe. Defendant then stated that Officer Hammond proceeded to go back into his pants pockets several times.

Defendant admitted to having "all kinds of stuff" in his pockets, including methamphetamine, cocaine, marijuana, morphine, hydrocodone, oxycodone, Percocet, Xanax, and Valium. Defendant testified that he had been arrested before but not for selling drugs. He stated that he had "dealt with the police quite a bit." However, he testified that this was his first arrest for drug possession. Defendant also acknowledged that his brother was a detective for the police department. Regarding the search,

- 6 -

Defendant reiterated that he did not give Officer Hammond permission to search his person and that he would not have given consent if Officer Hammond had asked for it. Defendant understood that Mr. Hale's vehicle had been stopped by Officer Ward because of an expired tag; however, Defendant stated that Mr. Hale had the updated tag in his vehicle and that Mr. Hale had shown the correct tag to the officer.

On cross-examination, Defendant denied being a drug dealer. Defendant admitted that he was a drug addict. He denied being high at the time of his arrest. He explained that he had "just [come] from eye surgery at the hospital over there and [he] didn't use any drugs other than what they gave [him]." Defendant denied being able to hear the conversation between Officer Ward and Mr. Hale because they were too far away from him. Additionally, he denied being able to hear them once he was out of the truck with Officer Hammond. Defendant recalled that when Officer Hammond felt the pipe in his pocket, "he just reached in [his] pocket and got it and pulled it out." He testified that "it was like [Officer Hammond] was excited that he found it." Defendant stated that he did not count the amount of drugs that were stuffed in the front of his pants, but he agreed that there were 22 60mg morphine pills, 12 100mg morphine pills, 5 200mg morphine pills, 12 1mg Benzodiazepine, 5 7.5mg hydrocodone, 1 10mg hydrocodone, 6 40mg Liz dexamphetamine pills, 2 4mg hydromorphones, 37 1mg alprazolam, and 7 1/2mg alprazolam.

Following the conclusion of proof, the trial court took the matter under advisement and later granted Defendant's motion to suppress. In its order granting relief, the trial court made the following pertinent findings of fact:

> The Court finds that [Defendant] gave permission to Officer Hammond to search him. He did a [*Terry*] patdown search and discovered a glass crack pipe. The Court finds that [Defendant] confirmed that it was a glass crack pipe. At this time, Officer Hammond placed [Defendant] under arrest and did a more thorough search finding a huge number of illegal drugs stuffed down [Defendant's] pants. *There is some conflicting testimony between the two officers and [Defendant]. The Court finds, however, that the credibility of the officers far outweigh[s] the credibility of [Defendant]. The Court accepts the facts as set out in the testimony of both the officers as being true in this case.* (Emphasis added).

> The Court finds that the initial stop for the lack of registration and running the red light was a constitutionally permissible stop. Although it is clear to the Court that the stop was permissible, it appears to be a routine traffic stop. It appears to be pre-textual stop although constitutionally permissible. The Court, however, has difficulty with removing [D]efendant from the

truck when he is not responsible for the traffic offense for which the stop was made. Although he gave permission to search his person, the Court has a difficult time in understanding how any search under the cite and release statute would be proper for [D]efendant in this case. It is true that [Officer] Hammond found a glass pipe on his [*Terry*] patdown at which time a thorough search would be permissible because the defendant would have been under arrest. However, there is no testimony in the record that this Court can recall that either officer had any reasonable suspicion that [D]efendant or Mr. Hale was armed and dangerous. Although the cite and release statute in Tennessee does not preclude a [*Terry*] patdown, it does not appear that there is any provision of this statute that would allow a [*Terry*] patdown without reasonable suspicion that the defendant was armed and dangerous. The Court cannot find from the evidence that this issue was established or that the officers had any reason to believe that [D]efendant was armed and dangerous. Consequently, although the initial stop was proper, there was no basis for removing the [D]efendant from the vehicle and performing any type of search based upon traffic offenses that were committed by Mr. Hale.

Following the order, the State filed a Motion to Reconsider. The State's motion challenged the trial court's ruling that "although the initial stop was proper, there was no basis for removing [Defendant] from the vehicle and performing any type of search based upon traffic offenses that were committed by Mr. Hale." The State further pointed out that the trial court, in its ruling, specifically made factual findings that the officers' testimony was credible, the stop of the vehicle was constitutionally permissible, and that Defendant gave Officer Hammond consent to search Defendant's person. The State relied upon *State v. Donaldson*, 380 S.W.3d 86 (Tenn. 2012). In *Donaldson* the supreme court held that a driver of a vehicle lawfully stopped for a traffic offense can be required to step out of the vehicle without that being a constitutional violation. *Donaldson*, 380 S.W.3d at 88, (relying on *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977)). The Court further held in *Donaldson* that the Fourth Amendment of the United States Constitution and article 1, section 7 of the Constitution of Tennessee apply coextensively in such circumstances. *Id*. at 96. Applying these rulings, the State argued that in Tennessee, it is also constitutionally permissible for officers, after making a traffic stop, to also require passengers to get out of the vehicle, in light of the holding in *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) ("[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop.").

The trial court denied the State's motion to reconsider its order granting the motion to suppress. The trial court noted the State's reliance on *Wilson* wherein the

Supreme Court held "that 'an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.'"

While admitting that it may have "inartfully drafted" the order granting the motion to suppress, the trial court clarified its basis for granting the suppression motion, stating as follows.

> The basis for granting the Motion to Suppress is that the Court did not hear any evidence which would indicate that either the driver or the guest passenger created any reasonable suspicion that they were armed and dangerous. Consequently, although the initial stop was proper, the Court feels that there was no basis for removing and searching [Defendant] with there being no testimony that [Defendant] created any reasonable suspicion that he was armed and dangerous.

## ANALYSIS

In its appeal, the State presents its issue that the trial court erred because Officer Hammond's request for Defendant to exit the truck was not a violation of Defendant's constitutional rights and because Defendant consented to Officer Hammond's search of Defendant's person. Defendant argues on appeal that Defendant's removal from the truck by request of Officer Hammond and the subsequent search of Defendant violated Defendant's constitutional rights. We agree with the State, reverse the order granting the motion to suppress, reverse the judgments dismissing each count of the indictment, reinstate each count of the indictment, and remand to the trial court for further proceedings.

When reviewing a trial court's ruling on a motion to suppress, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolutions of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Accordingly, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* Appellate courts conduct a *de novo* review of questions of law and the trial court's application of law to facts. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). The prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23.

The trial court's findings of fact are extremely well set forth in its order granting the motion to suppress and in its order denying the State's motion for reconsideration. The findings of fact establish that the following sequence of events occurred. Mr. Hale's

vehicle displayed an expired registration tag. Officer Ward initiated a stop of the truck, during which Mr. Hale ran a red light. Mr. Hale got out of the truck at Officer Ward's request. Five to seven minutes later, Officer Hammond arrived on the scene and asked Defendant to exit the truck. Defendant consented to be searched by Officer Hammond. Performing a *Terry* patdown, Officer Hammond discovered a glass crack cocaine pipe. Defendant confirmed it was in fact a glass crack cocaine pipe. At that point, Officer Hammond arrested Defendant and did a more thorough search of Defendant, finding a large number of illegal drugs stuffed down Defendant's pants.

Significantly, the trial court elaborated on its finding of facts by specifically stating it found "that the credibility of the officers far outweigh[s] the credibility of [Defendant]. The Court accepts the facts as set out in the testimony of both the officers as being true in this case."

We agree that the findings of fact made by the trial court are clearly supported by the evidence, even when the evidence adduced at the suppression hearing is viewed in its strongest legitimate view with reasonable and legitimate inferences, in deference to Defendant, the prevailing party on appeal. *See Odom*, 928 S.W.2d at 23. However, reviewing *de novo* the trial court's application of the law to the facts as found by the trial court, we conclude the trial court erred.

In its order granting the motion to suppress the trial court ruled that the officers had no right to remove Defendant from the truck because Defendant was not responsible for the traffic offense which led to the stop. The trial court also ruled, however, that the stop initiated by Officer Ward was constitutionally permissible. The trial court concluded in its ruling that despite Defendant's giving consent for his person to be searched, the court had "a difficult time in understanding how any search under the cite and release statute would be proper for [Defendant] in this case." The trial court also concluded that since there was no testimony by either officer that there was a reasonable suspicion that Defendant was armed or dangerous, Officer Hammond's *Terry* patdown during which the glass crack cocaine pipe was discovered was not constitutionally permissible. The trial court concluded its application of the law to the facts in its order granting the suppression motion by stating, "Consequently, although the initial stop was proper, there was no basis for removing [Defendant] from the vehicle and performing any type of search based upon traffic offenses that were committed by Mr. Hale."

As noted above, following the State's motion to reconsider, the trial court acknowledged it may have "inartfully drafted" the order granting the motion to suppress. The trial court then explicitly stated its legal conclusions upon which its decision was based, which is quoted above. Summarized, the trial court granted the motion because, at the time of the constitutionally permissible stop of Mr. Hale's truck, there was no

indication that either Mr. Hale or Defendant was armed or dangerous, and the removal of Defendant from the truck and the search of the Defendant's person violated Defendant's constitutional rights.

By explicitly stating its legal basis for its ruling in this case, the trial court implicitly rejected all other theories for relief asserted by Defendant on appeal and in his motion to suppress evidence. Defendant's argument that he did not consent to the search because he would never have consented to a search knowing all the drugs in his possession was rejected by the trial court's findings of fact and credibility determinations. The trial court basically addressed Defendant's argument that he should not have been required to exit from Mr. Hale's truck because Mr. Hale was stopped only for a citation and release offense pursuant to T.C.A. § 40-7-118(c). We reject the trial court's legal conclusions, including this assertion by Defendant. Defendant also argues on appeal that Mr. Hale should have just been given a citation and allowed to leave. He argues that the detention of Mr. Hale's truck was unconstitutionally extended in order to conduct a canine drug search, citing *Rodriguez v. U.S.*, _____ U.S. _____, 135 S. Ct. 1609 (2015). The trial court made no findings of fact to support Defendant's argument. However, the trial court specifically determined that "the facts as set out in the testimony of both officers as being true in this case." Thus, it is conclusive that Defendant was asked by Officer Hammond to step from the truck and Defendant gave his consent to be searched in approximately five to seven minutes after Mr. Hale's truck was stopped. Waiting for arrival of the drug-sniffing dog was not a factor. Five to seven minutes is well within the reasonable time period for an officer to address two traffic violations with the driver, here an expired registration tag and running a red light *after* the officer initiated the stop by turning on his blue lights. *See Rodriguez*, 135 S. Ct. at 1615. As we explain below, the constitutionality of Officer Hammond's request for Defendant to step out of the truck and Defendant's immediate consent to be searched, is not dependent upon the propriety of the request by Officer Ward for the presence of a drug-sniffing dog.

We conclude that *Maryland v. Wilson*, 519 U.S. 408 (1997) is controlling authority in the case *sub judice*, considered in conjunction with *State v. Donaldson*, 380 S.W.3d 86 (Tenn. 2012). In *Wilson*, the first paragraph of the opinion identifies the Court's holding. The Supreme Court said,

> In this case we consider whether the rule of *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977)(*per curiam*), that a police officer *may as a matter of course* order the driver of a lawfully stopped car to exit his vehicle, extends to passengers as well. We hold that it does.

*Wilson*, 519 U.S. at 410 (emphasis added).

- 11 -

In *Wilson*, the vehicle was stopped because it was violating the speed limit by going 64 miles per hour where the speed limit was 55 miles per hour, and the vehicle had no regular registration tag. The officer observed a torn piece of paper "dangling in the rear of the vehicle." *Id*. The paper had "Enterprise Rent-A-Car" written on it. The officer activated his blue lights and siren, but the vehicle continued driving for about 1.5 miles before it pulled over and stopped. The officer observed two passengers during the drive repeatedly turn to look at him, duck down below the line-of-sight, and then reappear. *Id*.

After the vehicle stopped, the driver got out and approached the officer. The driver was trembling and appeared very nervous. He produced a valid driver's license. The officer instructed the driver to return to the car and produce the car rental documents. The driver complied. While waiting on the driver, the officer observed that the front seat passenger, the defendant in the case, was sweating and appeared nervous. *Id*.

While the driver was in his seat looking for the documents, the officer ordered the defendant to get out of the car. When he got out of the car, "a quantity of cocaine fell to the ground." *Id*. at 411. The defendant was arrested and charged with possession of cocaine with intent to distribute. He filed a motion to suppress the evidence based upon his argument that being ordered out of the vehicle by the officer was an unconstitutional seizure under the Fourth Amendment. The trial court agreed and suppressed the evidence. This was affirmed by an intermediate state appellate court which concluded the ruling in *Mimms* does not apply to passengers of a vehicle. The state's highest court denied the State's writ for certiorari. *Id*. The Supreme Court weighed the strong public interest for the protection of officers during a traffic stop against the minimal intrusion upon a passenger being removed from the vehicle. *Id*. at 413-14. Since the passenger is already stopped from being inside the vehicle, the only change is that the passenger is outside rather than inside the vehicle. The Court reasoned that danger of harm to a police officer from the use of a weapon inside the vehicle is as great from a passenger as it is from the driver. *Id*. at 414. The court concluded that,

> In summary, danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car. While there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal. We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.

*Id*. at 414-15.

The State argued in the trial court that while it appears that our supreme court has not specifically ruled on the application of *Mimms'* holding to passengers, in *State v. Donaldson*, 380 S.W.3d 86, 92 (Tenn. 2012), the court held "in the context of traffic stops, the protections afforded by article I, section 7 of the Tennessee Constitution [are] coextensive with the protections afforded by the Fourth Amendment." The *Donaldson* court went on to adopt the *Mimms* rationale and held the officer in that case, who had stopped the defendant's vehicle because the defendant had driven past the white stop line before stopping at an intersection and turned right without giving a turn signal, *id*. at 88, "was entitled, as a matter of course, to remove the Defendant from the vehicle for a short period of time after making the stop." *Id*. at 93.

The holdings in *Mimms*, *Wilson*, and *Donaldson* apply to situations involving minor traffic offenses. In *Mimms*, the defendant was stopped because his vehicle had an expired license plate. *Mimms*, 434 U.S. at 107. In *Wilson*, the defendant was stopped because he was driving nine miles per hour over the speed limit and had no valid registration plate. *Wilson*, 519 U.S. at 410. In *Davidson*, the defendant was stopped because he drove past the stop line before bringing his vehicle to a stop, and he failed to use his turn signal as he turned right. *Donaldson*, 380 S.W.3d at 88. Under our *de novo* review, we conclude the trial court erred when it ruled that Officer Hammond unconstitutionally had Defendant step out of the vehicle.

As to the search of Defendant's person, upon *de novo* review, we also conclude that this did not violate any constitutional right of Defendant, pursuant to the trial court's detailed findings of facts. Also, the trial court specifically stated that "The Court accepts the facts as set out in the testimony of both the officers as being true in this case."

The trial court erroneously applied the limited search warrant exception found in *Terry v. Ohio*. The testimony of Officer Hammond, accepted as true by the trial court, was that as Defendant got out of the vehicle, Officer Hammond asked Defendant if he could search Defendant. Defendant responded "yes." Officer Hammond, in accordance with his usual preference when doing "an in depth search" patted down Defendant for weapons to make sure Defendant was not armed. Furthermore, Officer Hammond wanted to make sure no needle or open knife was in a pocket that could cause injury to his hand. During the patdown, Officer Hammond felt what he thought was a glass crack cocaine pipe. He asked Defendant what the object was, and Defendant stated it was a glass crack cocaine pipe. Defendant was placed under arrest for possession of the drug paraphernalia and handcuffed.

It is clear from the testimony that Officer Hammond knew he had been given consent by Defendant to do "an in depth search." However, he patted down the exterior

of Defendant's clothing for his own safety, not as an authorization for only a limited *Terry* search. On cross-examination Officer Hammond reiterated multiple times that he had consent to search Defendant's person, including his pockets, and the patdown was not his legal justification for any search but only for his own safety.

As noted by the State, voluntary consent is one of the exceptions to the requirement of a search warrant. *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996). The requirements for a lawful *Terry* patdown are irrelevant based upon the factual findings and credibility determinations made by the trial court. Officer Hammond had valid consent from Defendant to do a complete search of Defendant's person.

The State is entitled to relief in this appeal.

## CONCLUSION

Accordingly, the trial court's order granting the motion to suppress is reversed, the judgments dismissing each of the five counts in the indictment are reversed, and all the charges in the indictment are reinstated. The case is remanded to the trial court for further proceedings. Costs are taxed to Defendant.

_____
THOMAS T. WOODALL, JUDGE

- 14 -